# Whitley County Land Company v. Powers' Heirs.

(Decided February 15, 1912.)

Appeal from Whitley Circuit Court.

1.  Land—Constructive Possession—Rights of Junior and Senior Patentees.—There cannot be at the same time two persons in the constructive possession of the same body of land, and where there is a junior and a senior patent to the same land, the constructive possession follows the older title, and this possession cannot be defeated by the junior title holder except by actual entry and possession on the interference.

2.  Adverse Possession—What is Not.—The mere assertion of ownership, accompanied by occasional entries for the purpose of cutting timber and the payment of taxes, does not constitute adverse possession, no matter for how many years this character of ownership continues.

3.  Same—Against the Commonwealth.—As the statute provides that limitation runs against the Commonwealth, its right of entry can only be defeated by the same kind of adverse possession that would defeat the title of a patentee holding by constructive possession. The acts necessary to start and keep the statute in motion against the individual are necessary to start and keep it in motion against the Commonwealth.

4.  Adverse Possession by Adjacent Title Owner.—Where A. owns a tract of land, which he conveys to B. in connection with another adjoining tract that he does not own and that is covered by a senior patent, the fact that the deed described both tracts as one boundary did not have the effect of placing B. in the adverse possession of the land to which A. had no title, if B. continued to reside on the land to which A. has title, and never had physical adverse possession of the adjacent land. In other words, a man who is living on a tract to which he has title and which is outside of the plaintiff's claim, cannot obtain adverse possession of land within the plaintiff's older patent by simply taking a deed to it and continuing to live outside of the lap.

5.  Adverse Possession,—Ownership of Land, How Obtained.—Ownership of land in this State can only be obtained in two ways, (1) by what is called a paper title, and (2) by adverse possession.

6.  Same—Elements of.—Adverse possession cannot be sustained by intentions. It can only rest on physical acts, such as will give to the real owner of the land notice that some other person is in possession of it.

7.  Limitation Against Commonwealth.—In the absence of statutory authority, limitation does not run against the State; but, in 1856 the general law of limitation was made applicable to the Commonwealth, and this statute, now Section 2523 of the Kentucky Statutes, has been in force since that time.

8.  Patents—Issual of—Effect of, on Limitation.—If the statute of limitation is put in motion against the Commonwealth before a patent is issued, the issual of the patent does not stop the running of the statute, if the patentee only holds by constructive possession. The constructive possession of the patentee does not place him in any better position than the Commonwealth occupied before it issued the patent.

# Whitley County Land Co. v. Powers' Heirs.  803.

E. L. STEPHENS for appellant.

O'REAR & WILLIAMS, HAGER & STEWART, J. N. SHARP, L. L. PEACE, R. L. POPE, T. M. JONES and P. W. HARDIN for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

In this action which was brought by the appellant land company in August, 1907, to enjoin trespasses there is in controversy 114 acres of land, and the question is whether it is owned by the appellant land company or the appellees, the heirs of J. R. Powers. The facts of the case are very brief and simple, but the questions of law arising on the record are quite important.

In 1846 Thomas Foley obtained a patent to a tract of land containing 100 acres in the county of Whitley. Adjoining this tract of land, lies the 114 acres of land now in controversy, to which the appellees assert title as the remote vendees of Thomas Foley. They claim that Thomas Foley took adverse possession of the land in controversy in 1858 and that it has been held adversely by him and his vendees including appellees since that time. They further assert that independent of any adverse holding in the usual meaning of these words they are entitled to the land in controversy by virtue of a deed made to their ancestor, J. R. Powers, in 1888, by Milton Foley, who in 1882 obtained a patent for the land  The appellant land company traces its title to the land in controversy to Alfred Clapp, who in 1874 on a survey made in 1872 obtained a patent to a large body of land in Whitley county, including the land in controversy.

It may be said at this point that it is not disputed that the Clapp patent embraces the land in controversy, or that the appellant land company connects itself with the Clapp patent by a good chain of title, although some question is made as to the validity of this patent. It is also conceded that neither the land company nor any of its vendors ever resided upon, cultivated or in any way had the actual possession of the land in controversy, and that no acts of physical ownership were exercised over this land by the land company, or its vendors until

within a few years before the institution of this suit, when it had the land surveyed and the boundary marked.

The title of appellees to the 100 acres for which Thomas Foley obtained a patent in 1846 is not in issue, nor is it denied that Milton Foley, who became the owner of the 100 acres of land had surveyed and patented in 1882 the land in controversy, or that in 1888 he sold and conveyed to J. R. Powers both the land which was patented in 1846 and the land in controversy, the deed bounding and describing both parcels of land as one tract. Thomas Foley lived from 1846 until his death in a house situated on his .100-acre patent, and on the 100-acre patent have always lived his vendees, including Powers. In 1858 when it is claimed Thomas Foley took possession of the land in dispute, it had never· been surveyed to or patented by any person and was surrounded on all sides by the patented lands of Foley and four other persons, who have no connection with this litigation.

Taking up first the question of adverse possession relied on to defeat the claim asserted by the land company, J. R. Powers, who died in 1908, testified that when he obtained a deed from Milton Foley in November, 1888, the Foley 100-acre home tract and the 114 acres in controversy constituted one connected tract embraced in one boundary which was conveyed to him. That he moved in the house on the 100-acre tract in which Foley had lived, and resided there continuously, asserting exclusive ownership to the land in controversy, the exterior boundaries of which were well marked, but these marks were the old marks of the lines of the surrounding patents. That the land company did not own any land adjoining the land in controversy, which was bounded by the lands of Jones, Smith, Snyder, Crawley and the 100-acre Foley patent. ·He further testified ·that neither himself nor Foley, from whom he· purchased, had never cleared, cultivated or fenced any part of the land in controversy, and that there was no house on it. That the extent of his acts of ownership had been confined to the occasional· cutting of .timber and the payment of taxes. William P. Foley, who ·was seventy-five years old when he gave his evidence, said that he was a son of Thomas Foley and carried the chain when Harmon surveyed the land in controversy in. 1858 for his

brother, Milton Foley. That the lines that were run by the surveyor were the lines of older surveys, and that the surveyor did not go all around the land but only run a couple of these old lines. That no part of the land in controversy, which was all in timber, had ever been cleared, settled, fenced or cultivated. Milton Foley, who was eighty-four years of age, said that he lived some sixty-eight years on the 100-acre patent and was living there in 1858 when he had the land in controversy surveyed by J. E. Harmon, who happened to pass by, and he produced a receipt for the surveyor's fee given to him by Harman, reading: "Received of Milton Foley $1.70, part of surveying fee; also $3.30 for W. J. Foley. December 21, 1858." That he had the land resurveyed in 1881 by Chambers ,and thereafter purchased a warrant from the Whitley County Court, upon which he obtained a patent for the land in 1882. That from the time of the survey in 1858 he claimed the land in controversy in the same manner as he did his home farm, to the full extent of the boundary—treating both tracts as one body of land. Asked what acts of possession he exercised over this land, he said he paid tax on it, cut fire wood, and rail timber, and sold a little pine timber, but did not clear any of it; and that all of the exterior lines of this land in controversy were the lines of some of the older surveys that bounded it. Marion Jones, seventy-three years old, testified that he was a brother-in-law of Milton Foley, and remembered when Harmon made the survey. That Milton Foley cut some timber on the land and paid the taxes on it. That the boundary lines of the land in dispute had been plainly marked for 40 or 50 years, but that every line around the land in controversy was the line of the older patents by which it was surrounded and the marks he described were the marks of these old lines.

Putting aside for the moment the effect, if any, of Foley's patent to the 100 acres, his patent to the land in controversy in 1882, and the conveyance of both tracts in 1888 to Powers, we think it is very clear that if the claim of adverse possession from 1858 to 1874 when the Clapp patent issued was asserted against an individual title owner of the land in dispute, it would be entirely insufficient to defeat his right of entry and possession. There was no settlement, no enclosure, no cultivation. The only evidence of adverse possession, aside from the naked claim of ownership, was the payment of taxes,

occasional entries on the land for the purpose of cutting timber, and the fact that the lines were marked by the marks of the lines of older and surrounding surveys. The boundary of the land in controversy was never marked by Foley or the surveyor, Harmon. The surveyor simply adopted the marks of the older surrounding patents, and indeed only run two short lines. We have repeatedly and uniformly ruled that the acts we have described are not sufficient to make out a title by adverse holding, no matter for how long a period these acts have continued. In Wilson v. Stivers, 4 Dana, 634, the court said:

"It is well settled, by repeated adjudication, that the settlement and residence of Stivers and those under whom he claims, outside of the elder patent, did not give them possession of the interference. And it has been also repeatedly decided that, under such circumstances, the occasional use of the land within the interference, as by cutting timber on it, though continued for twenty years, does not give such a possession as bars the right of entry under the elder patent." To the same effect is Lillard v. McGee, 3 J. J. Mar., 552; Caskey v. Lewis, 15 B. Mon., 27.

In Smith v. Morris, 7 J. J. Mar., 442, the court said: "Before the junior patentee can acquire such a possession, we deem it essential that he should have entered upon the interference, and commenced an improvement of a permanent character, if it be woodland in the wilderness state, and carried on the improvement begun by continued acts, until it shall be completed. If an improvement so made shall be enjoyed until there is twenty years complete from the date of such entry, then the statute may be applied from the date of the entry, and commencement of the work; but occasional chopping within the interference, and carrying away timber, will not do."

In Trotter v. Cassady, 3 A. K. Mar., 365, this court said on the subject of adverse possession:

"It is necessary that the possession claimed as adverse should be shown to be continued and uninterrupted. Or, in other words, if there is any period during the twenty years in which the person having the right of entry could not find an occupant on the land on whom he could bring and sustain his ejectment that period cannot be counted against him as part of the twenty years."

In Jones v. McCauley, 2 Duv., 14, it is said:

"To bar ejectment by time, the adverse possession must have been not only actual, but so continued for twenty years as to have furnished a cause of action every day during that whole period, and, consequently, as conclusively and consistently adjudged, claim of title, however notorious, and occasional use under that claim, without actual possession, continued without intermission or interruption for twenty years, will not bar an adverse right of entry."

Keeping in mind the fact that the Commonwealth did not part with its title to the land in controversy until it issued to Clapp the patent of 1874, two questions naturally arise, first, did limitation on account of the acts of Foley in reference to this land run against the Commonwealth from 1858 to 1874, and second, if it did, what acts of adverse possession are necessary to defeat the ownership and title of the Commonwealth. In the absence of express statutory authority, it is well settled that limitation does not run against the State. Therefore, if there was no statute of limitation affecting the Commonwealth, no character of adverse holding on the part of Foley, no matter for how long a time it might have continued, would bar the right of entry and possession in the Commonwealth. Hartley v. Hartley, 3 Met., 56; Campbell v. Thomas, 9 B. Mon., 82; Chiles v. Calk, 4 Bibb, 554. Although this court in Asher v. Howard, 122 Ky., 175, Buckner v. Kirkland, 110 S. W., 399, and perhaps in other cases, overlooking the statute of 1856, held that there was no statute of limitation applicable to the Commonwealth until 1873, it is nevertheless a fact that in 1856 the Legislature adopted a statute that may be found in Section 9, Article 3, Chapter 63, of the Revised Statutes of 1856, providing that—

"The limitation prescribed in this chapter shall apply to actions brought by or in the name of the Commonwealth in the same manner as to actions by private persons except where a different time is prescribed by some other chapter in this revision."

And this statute, in precisely the same language, has been in force since 1856 and is now Section 2523 of the Kentucky Statutes. So that, since 1856, limitation run against the Commonwealth in precisely the same manner as it would run against an individual; and, if the statute would defeat the claim of an individual, so it would defeat a claim asserted by the Commonwealth. It

follows from this that if the statute of limitation was put in motion by the entry of Foley upon this land in dispute in 1858, it continued to run against the Commonwealth if the adverse possession was of such a character as to keep it in motion from 1858 until the patent was issued to Clapp in 1874, and to run against Clapp upon the same conditions as it did against the Commonwealth for several years after Clapp obtained his patent, as Clapp, or his vendees did not attempt to take actual possession of the land or have anything other than a constructive possession until long after the expiration of 15 years from 1858. The issual of the patent to Clapp in 1874 did not stop the 15 year statute from running, if it was set in motion in 1858 and maintained in motion, as the constructive possession by Clapp under his patent did not place him in any better position than the Commonwealth occupied before it issued the patent. In other words, the Commonwealth conferred on Clapp all the right, interest and title in the land that it possessed at the date of the issual of the patent—no more and no less. This principle was declared in Beeler v. Coy, 9 B. Mon., 312, where the court said:

"It is true the issuing of a patent at any time, by the Commonwealth, apparently implies the assertion of title at the time and the negation of any previous grant by her. But as the patent is actually issued at the instigation and upon the suggestion of the individual who obtains it, and for the purpose of subserving his interest, it cannot be regarded as an evidence of the public judgment or will upon the question of title, or as involving any other act on the part of the Commonwealth, but that of transferring to the individual whatever title she may have, with authority to assert or use it for his own interest, in such manner as he may choose and the laws may allow. The issuing of a patent at any time, not being a direct assertion of title by the Commonwealth against the tenant in possession, nor conclusive as to the question of a prior grant, we do not see why it should operate, per se, to stop the presumption in favor of a possession, under claim of title, nor why, if such possession is permitted to remain undisturbed until the end of fifty years from its commencement, the presumption of title should be less availing against a patent issued a few years before, than against one issued shortly after the expiration of that period. The contest is not between

the Commonwealth and an individual, but between two individuals, both claiming under the Commonwealth, the one evidencing his title by long possession under claim of title, the other by a recent patent." To the same effect is Keaton, v. Sublett, 109 Ky., 106.

It will therefore, be seen that if Foley took adverse possession of this land in 1858, and this adverse possession continued for fifteen years, it would defeat the patent title of Clapp and the constructive possession thereunder, although the patent may have issued before the expiration of the fifteen years. In this particular case the patent did not issue until after the expiration of fifteen years, unless it may be said to have related back to the date of the survey in 1872, as it was provided in the Revised Statutes of 1856, as it is now in Section 4704 of the Kenucky Statutes, that the legal title of the land shall bear date from the time of making the survey. It is not however material under the circumstances of this case whether the patent to Clapp should be treated as having been issued before or after the expiration of fifteen years from 1858, as, in either event, the constructive possession of Clapp did not stop the running of the statute in favor of Foley, if it run at all.

The next question is—what character of adverse holding is necessary to defeat the claim of the Commonwealth. The title and ownership of all the land in this State was originally in the State. Kentucky Statutes, Section 2337. And this title and ownership continues until the State disposes of the land by patent or until its right is defeated by adverse possession. As the land in controversy had not in 1858 been disposed of by the State, and as no one had prior thereto settled on or attempted to take possession of it, the undisputed ownership of the land was in the State when Foley claims he had it surveyed in 1858 and annexed it to his other land. This being the condition in 1858, did the acts of Foley put in motion and maintain in motion the fifteen-year statute of limitation to such an extent that at the end of the statutory period of fifteen years he had a good possessory title to the land as against the Commonwealth and Clapp. As the statute provides that limitation shall run against the Commonwealth in the same manner that it runs against an individual, we think the title of the Commonwealth to land undisposed of by it should be treated in the same manner as the title of a patentee

followed by constructive possession only, and that it logically and necessarily follows that the title and right of entry on the part of the Commonwealth can only be divested or defeated by the same kind of adverse possession that the title and right of entry of a patentee holding by constructive possession could be divested and defeated. The statute of limitation begins to run against the Commonwealth at the same time that it would begin to run against an individual. The acts necessary to start and keep the statute in motion against an individual are necessary to start and keep it in motion against the Commonwealth. No reason can be assigned why any distinction should be made between the Commonwealth and an individual. This principle was recognized in Keaton v. Sublett, supra, where the court said:

"The same holding which constitutes actual possession of an individual's land will constitute actual possession of that belonging to the Commonwealth. Having entered upon the land, and claimed to a well-defined boundary, although the land was vacant and unappropriated at the time he took possession, and during the time he held it, his actual possession was co-extensive with the boundary claimed."

And in Fray v. Soden, 120 Ky., 277, where the court in speaking of the statute of limitation applicable to the Commonwealth before quoted, said:

"The section quoted is part of the chapter containing the law of limitation as to real property, and by its terms it must apply to the Commonwealth the same as an individual."

It follows from what we have said that there was no adverse holding of this land by the Foleys that would defeat the title or right of entry of the Commonwealth or any person and therefore the assertion of ownership to the land in dispute on the ground of adverse possession on the part of the appellees must fail.

The next question to be considered is, the effect of the patent obtained to this land by Foley in 1882, and the deed made by him to Powers in 1888, and the actual possession of the 100-acre adjoining tract by Foley and his vendees, to which Foley obtained the patent in 1846. It is as well settled as any principle in the land laws of the State can be that two persons cannot at the same time be in the constructive possession of the same body of

land, and that in a contest between constructive title owners the oldest title must prevail. This principle is aptly stated in Jones v. McCauley, supra, where the court said:

"There can be no constructive possession of the same land by conflicting claimants. In the absence of any actual possession, if there be any constructive possession, it must necessarily be in the holder of the best title, unless he had renounced it. And his constructive possession can never be ousted by any constructive possession claimed under the inferior title; nothing short of renunciation or actual disseisin can evict him."

Applying this principle to the facts of this case, and putting out of view the question of adverse holding which we have found insufficient, it is apparent that the constructive possession of the land in dispute by Foley under the junior patent issued to him in 1882 could not defeat the senior title and constructive possession of Clapp by virtue of the patent issued to him in 1873. But, independent of this, the patent obtained by Foley in 1882 was void under Section 3 of Chapter 109 of the General Statutes then in force, reading:

"None but vacant land shall be subject to appropriation under this chapter. Every entry, survey or patent made or issued under this chapter shall be void so far as it embraces land previously entered, surveyed or patented."

So that, when Foley in 1888 conveyed this land to Powers, Foley had neither a paper nor a possessory title to any part of it.

The remaining question in the case is this, Does the fact that Foley conveyed to Powers the land in dispute in 1888 by a deed the boundaries of which included both the 100-acre patent and the land in dispute, describing both as one tract, and placed him in possession thereof, which possession he retained for more than fifteen years before this suit was brought, have the effect of defeating the right and claim of the land company? It is insisted by counsel for appellees that it does, and that this court has so ruled in more than one case. But, in our opinion, Powers did not occupy any other or better position with reference to this adjacent land than would any other person who residing miles away had obtained under similar circumstances a deed to it, and exercised like acts of ownership over it. The mere fact that the tract

to which he had a good title adjoined it, will not be allowed to increase his right of ownership. Ownership of land in this State so far as we are advised can only be obtained in two ways—one, by what is called a paper title tracing back to the Commonwealth, and the other, by adverse possession. And adverse possession cannot be sustained by proximity or intentions. It can only rest on physical acts—such as will give to the real owner of the land notice that some other person is in possession of it. In short, to constitute adverse possession there must be such open and notorious acts of physical possession as would put the owner of the land—assuming him to be a person of ordinary prudence and diligence in looking after his estate—upon notice that a hostile claim was asserted to his property. And this character of claim and possession must be continued for fifteen years or more, to a well defined boundary. The surveying and marking of a boundary, the payment of taxes, as well as occasional entries for the purpose of cutting timber or other temporary uses, are incidents of adverse possession, but neither one nor all are sufficient in themselves to constitute adverse holding so as to defeat the title and possession of the true owner. It is not necessary that actual notice of the adverse holding should be brought to the attention of the owner. It will be sufficient if the acts of the adverse claimant are of such an open visible and notorious character as would put the owner upon notice that a hostile claim was asserted. To illustrate, suppose that in each year from 1888 to 1904 the Whitley County Land Company had sent its representative over its lands to see in what condition they were, or who, if any person, was in possession of or trespassing upon them; and, this representative had gone around and over this land. He would not have found a single evidence of any kind or character that any person had ever settled on it or enclosed or cultivated any part of it, or exercised any acts of ownership over it. He would probably have found that a few trees had been cut here and there, but that is all; and, he would have reported to his employers that their land was undisturbed. And yet, if the contention of counsel for appellee is sound, the claim of Powers to this land was in each of these years silently, quietly and without notice to any person ripening into a title that in fifteen years would completely divest the appellant land com-

pany of its title. The principle of law, that would permit the acquisition and divesting of title in this manner has never obtained in this State. In Trimble v. Smith, 4 Bibb 257, decided in 1815, it appears that the plaintiff derived title to the land in controversy under a patent bearing date of 1775, and the defendants under a patent of a later date, interfering in part with each other. That the defendants had settled upon and occupied for more than twenty years that part of the land included in their patent, which was not within the interference, but had not settled upon or occupied that part of it that was within the interference, and that the plaintiff had never been in the actual possession of any part of the land covered by his patent previous to the bringing of the action. Upon this state of facts, the court said:

"Where there is no adverse possession there can be no doubt that a man by an entry into part of a tract may acquire the possession of the whole, provided he may lawfully enter upon the whole; but to construe an entry into part to which he has right, to give him possession of another part to which he has no right, would be making an act which was right in itself tortious. This would be wholly unwarranted by any precedent, and in direct violation of the principle of law which requires where an act is done which is susceptible of a two-fold construction, one of which is consistent with law and the other not, that the former should prevail. * * * Now as the entry of the defendants in this case upon the part of their tract not within the interference, if construed to give them possession of the land within the interference, would have the effect of divesting the plaintiff of his right, it is clear that such a construction is contrary to the law as laid down by Coke. Indeed, if such a construction should prevail, a party having right might be divested of his right without any wrong being in fact done to him, or any possibility of knowing that any act was intended to be done."

The principle announced in this case has been approved in a long line of decisions, reaching from 1815 down to 1910, among them we may mention, Fox v. Hinton, 4 Bibb 559; Smith v. Mitchell, 1 A. K. Mar., 207; Trotter v. Cassady, 3 A. K. Mar., 365; Bodley v. Logan, 2 J. J. Mar., 254; Shrieve v. Summers, 1 Dana 239; McCoy v. LeLong, 22 Ky. L. R., 720; Jones v. Patterson, 23 Ky. L. R., 1838; Hall v. Blanton, 25 Ky L. R., 1400;

Woodward v. Johnson, 28 Ky. L. R., 1091; Arthur v. Humble, 140 Ky., 56; Ramsey v. Thomas, 140 Ky., 356; Curtiss v. Warden, 144 Ky., 383.

In Bowling v. Breathitt Coal, Iron & Lumber Co., 134 Ky., 249, the facts were almost identical with the facts in this case, and the court said:

"So the question comes to this, can a man who is living on a tract to which he has title and which is outside of the plaintiff's claim, obtain adverse possession of land within the plaintiff's older patent by simply taking a deed to it and continuing to live outside of the lap."

Then, referring to Trimble v. Smith, and many of the other cases cited, the court continued:

"If, in a case like this, a man could, while living on land which he admittedly owned, gain title within an elder patent which adjoined him, by simply marking off a boundary and taking a deed from some one to it, when there was nothing on the land to put the owner on notice of his adverse claim to it, there would be no security for land titles, and the entire doctrine that the settlement of the junior patentee, when without the lap, will give him no possession within the senior patent, would have to be abandoned. The plaintiff, having the title to the land was in the constructive possession of it. The defendant could not defeat this constructive possession by merely living on an adjoining tract of land not included in the plaintiff's patent, and claiming land within that patent."

The cases relied on by counsel for appellee as being in conflict with the ones to which we have referred are Taylor & Crate v. Burt-Brabb Lumber Co., 109 S. W., 348; Buckner v. Kirkland, 110 S. W., 399; Hillman Land & Iron Co. v. Marshall, 119 S. W., 180; Overton v. Perry, 129 Ky., 415; Northup v. Sumner, 132 Ky., 156; New Domain Oil & Gas Co. v. Gaffney Oil Co., 134 Ky., 792; Richie v. Owsley, 137 Ky., 63; 143 Ky., 1. Considering the great number of land cases decided by this court in its history, it is not singular that there should in some of the opinions be conflicting expressions, but we do not think that any case can be found resting upon a state of facts such as is here presented, in which the principle announced in Trimble v. Smith has been distinctly or purposely departed from. It is true that in the cases cited by counsel there are expressions in conflict with the cases relied on to support the views announced in this opinion, but a careful analysis of those cases will

show either that the question here involved was not directly presented or that the facts were different from the facts appearing in this record, and many, if not all, of them could well be distinguished from this case but we do not think it would be profitable to extend this opinion in reviewing these cases for the purpose of explaining or distinguishing them from the line of decisions that we have followed.

Wherefore, the judgment is reversed with directions to enter a judgment in conformity with this opinion.