## War Fork Land Company v. Marcum.

(Decided April 30, 1918.)

### Appeal from Jackson Circuit Court.

1. Principal and Agent—Subsequent Grant of Authority Will Not Validate Prior Acts of Agent.—Where a person assuming, without authority, to act for another, does something in the name of the other, his act will be void as to the principal, and the fact that the principal may subsequently authorize the party, acting without authority, to do such things as he did without authority,

will not impart validity to his acts prior to the giving of the authority to perform them.

2. Principal and Agent—Subsequent Grant of Authority Will Not Validate Prior Acts of Agent.—Where B, without authority so to do, conveyed a tract of land to C as the agent of A, the fact that A subsequently, and without knowledge of what B had done, authorized him to convey the land, did not impart validity to the previous conveyance made by B. It was void.

3. Principal and Agent — Ratification—Definition of.—Ratification implies knowledge and without knowledge there can be no ratification. A party cannot be estopped by some act or conduct of another that he did not authorize and never knew anything about.

4. Vendor and Purchaser—Title Subsequently Acquired Will Inure to Benefit of Vendee.—If a party who has no title to land sells and conveys it with covenant of general warranty, and thereafter comes into the title to the land so previously sold, his title will inure to the benefit of the grantee.

5. Estoppel—Laches—When Party Not Estopped by.—A party can not be estopped by his laches or failure to act unless he was under some duty to take notice of the matter in controversy, and the owner of land is under no duty to take notice of its sale by a stranger, and is not estopped by length of time to set up title to his land that was wrongfully sold in the absence of notice of its sale.

6. Deeds—Constructive Notice—Scope and Limitations of.—The purchaser of land from the owner who had theretofore granted power of attorney to another party to sell it, is only charged with constructive notice of what the agent did subsequent to the power of attorney, and is not charged with notice of what the agent may have theretofore done, and at a time when he had no authority to do anything.

7. Adverse Possession—Adjoining Landowner.—Where the owner of a tract of land of which he is in the actual possession under a good title gets a deed to an adjoining tract from a person who had no title, and thereafter includes the land to which he had title, as well as the land to which he had no title, in a marked boundary, he cannot assert title by adverse possession to the land to which he had no title, as against the real owner of it, unless he actually enters upon and takes possession of the land to which he had no title.

METCALF & JEFFRIES for appellant.

J. R. LLEWELLYN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This is a controversy between the War Fork Land Company and James Marcum as to the ownership of two tracts of land in Jackson county, one containing one hundred acres and the other a one-half interest in fifty

acres. In 1860 Philip Marcum obtained a patent to the one hundred acres, and in 1860 a patent was issued to Philip Marcum and George M. Pigg for the fifty acres, and both of the parties to this litigation claim the land under conveyances made by Philip Marcum.

The War Fork Land Company traces its title to Philip Marcum in this way: On March 6th, 1872, as appears from the record, one John Marcum made a deed to George M. Pigg conveying to him the one hundred-acre Philip Marcum patent and Philip Marcum's undivided one-half interest in the fifty acres patented to Philip Marcum and George M. Pigg. This conveyance purports to have been made "By Philip Marcum of the first part and George M. Pigg of the second part" for the recited consideration of $200.00 paid in cash. The deed is signed "Philip Marcum by John Marcum," and in July, 1873, it was acknowledged "By John Marcum, Attorney for Philip Marcum to be his act and deed," and was recorded on the date of its acknowledgment in the clerk's office of the Jackson county court. This deed contains the following covenant of warranty: "To have and to hold the same with appurtenances unto the party of the second part his heirs and assigns forever and the said party of the first part does further covenant with the said party of the second part that he will warrant and forever defend the title to the foregoing described land and premises from the claims of himself and his heirs and assigns forever also if the land is lost by any other claim the party of the first part covenants to refund to the party of the second with interest the consideration above acknowledged . . . ." Subsequently by mense conveyances from Geo. M. Pigg these lands came into the possession of the War Fork Land Company.

It will thus be seen that John Marcum, in making this conveyance, assumed to act as the attorney in fact of Philip Marcum, although he was not, as is admitted, at this time, the attorney in fact of Philip Marcum, nor did he have at this time any authority, verbally or in writing, to act as the agent, or attorney in fact, of Philip Marcum; nor does the record disclose why he assumed the authority to make the conveyance. It appears, however, that subsequent to this and on February 9, 1874, Philip Marcum and his wife, Mahala Marcum, did appoint John Marcum their attorney in fact to sell and convey all lands owned by them in the

counties of Jackson and Clay. This power of attorney reads as follows: "Know all men by these presents that we the undersigned Philip Marcum and Mahala Marcum, his wife, of the town of Pineville, county of McDonald and state of Missouri have this day made and constituted and appointed, and do by these presents make, constitute and appoint John Marcum, county of Jackson and state of Kentucky, our true and lawful attorney for us and in our name to sell and dispose of absolutely in fee simple the following described lot or parcel of land or any part thereof situate, lying and being in the counties of Clay and Jackson and state of Kentucky, to-wit: All lands belonging to us in the county of Jackson and county of Clay in the state of Kentucky and to do and transact any and all business, collect all debts due us and do all other things necessary to be done as if we were personally present at the doing of the same for such price or sum of money and to such person or persons as he shall think fit and convenient and also for us and in our name and as our act and deed to sign, execute and acknowledge and deliver such deed or deeds and conveyances for the absolute sale and disposal thereof, or of any part thereof with such clause or clauses, covenant and agreements to be therein, contained as our said attorney shall think fit and expedient hereby ratifying and confirming all such deeds, conveyances, bargains, sales which shall at any time hereafter be made by said attorney touching or concerning the premises." It further appears that this power of attorney was acknowledged by Philip and Mahala Marcum on the day it was written, and that on April 15, 1875, it was recorded in the clerk's office of the Jackson county court.

James Marcum, the appellee, asserts title to the land in controversy by a deed made to him in June, 1914, by Philip Marcum, patentee, who was then a single man and a resident of Oklahoma.

As the deed made to George M. Pigg, the remote vendor of the War Fork Land Company, by Philip Marcum purporting to act through his agent and attorney, John Marcum, was executed and recorded in 1873, many years prior to the conveyance made by Philip Marcum to the appellee, James Marcum, it will at once be seen that if the conveyance made to George M. Pigg was valid, the War Fork Land Company has the superior

title to the land in dispute, and so the principal question in the case turns on the validity of the deed made by John Marcum, purporting to act as the agent of Philip Marcum, to George M. Pigg. If, however, this deed was not valid, then the appellee, James Marcum, has the superior, and in fact the only paper title to the land.

On behalf of James Marcum, the argument is advanced that as the deed to Pigg was made about two years before John Marcum was authorized by the power of attorney to sell and convey the land of Philip Marcum, and at a time when it is confessed that John Marcum had no authority to make the conveyance, it was and is a void deed, and consequently did not divest Philip Marcum of his title to the land, although, subsequently, Philip Marcum, by the power of attorney heretofore referred to, authorized John Marcum to convey all of his lands in Jackson county, which would, of course, include the land theretofore conveyed by him to George M. Pigg.

In opposition to this it is the contention of the War Fork Land Company that although James Marcum had no authority to make the conveyance to Pigg at the time he did, his subsequent authority, under the power of attorney, related back to and imparted life into the conveyance previously made, and it is further said that this power of attorney, in effect, amounted to a ratification by Philip Marcum of what John Marcum had done.

At this point we may stop a moment to consider the evidence bearing on these transactions: James Marcum, the appellee, merely testified that he had acted as the agent of Philip Marcum, who was his uncle, in looking after his land in Jackson county for about twenty years before this suit was brought, and that Philip Marcum claimed to be the owner of several tracts of land in Jackson county that he had never sold, among them the tracts that he deeded to him in 1914. John Marcum, who acted as agent for Philip Marcum, did not testify nor do we find in the record any explanation of his failure to do so. Philip Marcum, offered as a witness by James Marcum, the appellee, testified as follows: "Q. Are you the same Philip Marcum that sold and conveyed to James Marcum the plaintiff in this case, a 100-acre tract of land on War Fork creek in Jackson

county, Kentucky, and one-half interest in a 50-acre tract on the waters of War Fork, in 1914? A. Yes, sir, . . . . Q. Did you ever sell or convey to G. M. Pigg or any other person, except the plaintiff, James Marcum, this 100-acre tract of land? A. I never sold or conveyed it to any one but James Marcum. Q. Did you ever receive anything as payment from G. M. Pigg or any one else for this land, except what you received from James Marcum for it when you sold and conveyed it to him? A. I never sold or conveyed this land to any one until I sold it to James Marcum, and never received one cent from any other person for it, except what I received from him; I never received anything from G. M. Pigg in any way for this land. Q. Do you remember making John Marcum a power of attorney to sell lands for you in Jackson and Clay counties, while you were in the town of Pineville, in McDonald county, Missouri, in the year 1874? A. Yes, sir; I remember making him this power of attorney. Q. Did you ever at any time execute or make to John Marcum any other power of attorney to sell lands for you in Jackson county, Ky.? A. I never did, never made him but the one power of attorney. Q. Did you ever give him any authority to sell any land for him or attempt to convey any land for you, while at Pineville, Mo., in 1874? A. No, sir; I never gave him leave or authority to sell any of my land in Jackson county, Ky., before I gave him this power of attorney in 1874, and never gave him any authority to convey or attempt to convey any of my land, and he did this, he did it without my consent or authority. Q. Did you ever receive anything from G. M. Pigg or from him through John Marcum for land at any time before or after you made this power of attorney to him in 1874? A. No, sir; I never did. Q. Did you ever sell or convey your half interest in this 50-acre tract of land to any one, until you sold it to James Marcum in 1914? A. No, sir; I did not. Q. Did you ever receive anything from any one for it, except what you received from James Marcum? A. No, sir; James Marcum is the only one that I ever got anything from for my half interest in this tract of land. Q. Did you ever sell, convey or assign your interest in this 50-acre tract of land to G. M. Pigg? A. No, sir; I never did, nor to any one else until I sold it to James Marcum. Q. Did you ever know of the Thomases or the War Fork Land Co., having a painted

line around either or both of these tracts of land? A. No, I didn't know anything about that, I never heard of it before. Q. Did you ever know of either of them claiming to be the owner of these tracts of land or either of them? A. I never heard anything about that until I sold the land to James Marcum. . . . . Q. Have you any interest in this action, direct or indirect; if any, what is it? A. I have no interest in this suit except that I deeded the land to the plaintiff and I understand that he and the defendant company are lawing over it. Q. Have you stated all you know concerning this action; if not, state what you have omitted? A. I have stated about all I know about it.''

It will thus be seen that there is no evidence, in the record, that Philip Marcum consented to the conveyance made to George M. Pigg by John Marcum, or that he had any knowledge or information that this conveyance had ever been made. It is true that under the power of attorney John Marcum was authorized to make such a conveyance as he did make previous to the power of attorney, but it stands admitted that he had no authority whatever to make the conveyance at the time it was made. It must, also, be conceded that Philip Marcum never ratified, in any manner, the act of John Marcum making this conveyance, for the simple reason that Philip Marcum never knew anything about it, and it is too well settled to require even the citation of authority that a party cannot be charged with notice of something that he did not authorize and never heard of, or be estopped by some act or conduct of another party that he never knew anything about. Ratification implies knowledge, and without knowledge there can be no ratification. It is, also, plain that nothing can be found in the power of attorney that would justify an opinion that, by this power of attorney, Philip Marcum ratified what John Marcum had previously done, because the power of attorney expressly states that Philip Marcum only ratified and confirmed ''Such deeds, conveyances, bargains, sales which shall at any time hereafter be made by said attorney touching or concerning the premises.'' We may, therefore, dismiss, without further comment, the argument of counsel that Philip Marcum ratified the act of John Marcum in making the deed to Pigg.

But it is further said that a power of attorney, authorizing the doing of certain acts by an agent will, in itself, amount to a confirmation of acts previously done by him without authority if he was authorized by the power of attorney to do such things as he did before the power was granted, but after a careful investigation of the authorities we have been unable to find any supporting this proposition; on the contrary, the only authority that we have found is opposed to it, and this authority seems to rest on sound principles. It is difficult to understand upon what theory a power of attorney, conferring only authority to thereafter do certain things, can be construed into authority to previously do these same things. The authority of an agent, under a power of attorney, is confined to the powers conferred on him by the instrument, and to that, any person desiring to know his authority must look. So that when the War Fork Land Company came to investigate, as they likely did, the title to the land they could not have failed to discover that John Marcum had no authority to make the deed to Pigg, and that subsequently to the power of attorney he did not make any of the conveyances that he was authorized to make so far as the land here in question is concerned.

A case directly in point is Moore v. Lockett, 2 Bibb. 67. In that case, Lockett contended that Moore was entitled to one-half of a tract of land patented in the name of January; that Evans as he alleged was authorized by Moore to sell, and did in 1784 sell two hundred acres of it to Henderson, and Henderson, in 1787, to him, assigning to him the Evans bond. Moore denied that Evans had any power to sell the land to Henderson. It further appears, from the opinion, that subsequent to 1784 Moore did give Evans authority to make the sale, but the court, in holding that this subsequent authority did not impart life to the previous act of Evans in selling the land, said: "This power being given after the sale to Henderson, can have no influence upon the decision of the question; for if the agent exceeded the scope of his authority in making the sale, a subsequent extension of his power, without a ratification of what had been done, could not legalize it." Another case announcing the same principle is Britt v. Gordon, 132 Ia. 431, in which the court, in holding that a power of attorney to do future acts did not itself amount to a

ratification of acts already done by the appointee, said:
"But deeper still is a principle of almost universal ap-
plication that a power of attorney to do future acts,
which is what the one in suit amounted to, does not
amount to a ratification of acts already done by the ap-
pointee. . . . . And, further, an agent or attorney
does not have power to ratify his own unauthorized or
illegal acts. No citation of authority ought to be neces-
sary to so plain a proposition as this. If this were not
so, an agent would have unlimited authority, and it
would be useless to attempt to guard it. Moreover, it
would allow an agent to perpetrate the most outrageous
frauds upon his principal. But here the act which it is
claimed the attorney ratified is not shown to have been
done originally on behalf of his principal. Indeed the
contrary appears. That act was of a mere intermed-
dler, the intermeddler being the agent himself, and,
without knowledge or express or implied authority from
the principal, the agent or attorney had no authority to
ratify it."

There is a well-known principle of law to the effect
that if a party, who has no title to land, nevertheless
sells and conveys it with covenant of general warranty,
and thereafter comes into the title to the land so pre-
viously sold his title will inure to the benefit of the
grantee. Logan v. Moore, 7 Dana 74; Dickerson v. Tal-
bot, 14 B. M. 49; and it is sought to apply this principle
to the facts of this case, but we are unable to perceive
any analogy between the two. If a person sells with
covenant of warranty, land to which he had no title and
thereafter he acquires title to the land, it would be,
manifestly, unjust to permit him to defeat the title he
had conveyed with a covenant of warranty, by there-
after setting up a hostile title in himself, but where a
person, as in this case, has, without authority, under-
taken to sell and convey the land of another person, it
is too plain for argument that the real owner of the
land should not be precluded by this wrongful act from
asserting his title to the land.

Another contention in behalf of the War Fork Land
Company is that as John Marcum was authorized in
1874 to sell the land owned by Philip Marcum in Jack-
son county, Philip Marcum should be charged with
notice that John Marcum may have acted under the
power, and, therefore, his failure to take any measures

to inquire into what John Marcum did until 1914, was such laches as would estop him from selling the land in 1914 that he had given authority to John Marcum to sell in 1874. A sufficient answer to this is, as we think, that John Marcum did not sell the land in controversy under the power of attorney, therefore, the authority conferred by the power remained wholly unexecuted, and Philip Marcum, having never parted with his title to this land, continued the owner of it, and had the right to sell it whenever it suited his pleasure. There is no question of laches or negligence in the case. The question of time so far as this issue is concerned can add nothing to the strength of the claim of the War Fork Land Co., because, as we have determined, it never had any title to the land.

There is a further suggestion that as the power of attorney was put on record, as well as the deed previously made by John Marcum to Pigg, James Marcum was charged with at least constructive notice of the fact that the land, at the time he purchased it, had been previously conveyed. It may be admitted that James Marcum had constructive notice of the power of attorney; but, assuming this, he was not required to look back of the power of attorney; he was only put on inquiry and notice as to what took place subsequent thereto, and the record showed that the land here in controversy had not been sold or disposed of under the power of attorney. But even if James Marcum had actual notice of the deed made by John Marcum to Pigg, he had the right to ignore it because it was a void thing.

The remaining issue relates to the assertion of claim on the part of the War Fork Land Company to the land in question under its alleged adverse holding. It appears that the War Fork Land Company owned in 1914, and for many years prior thereto, a body of land containing about twelve thousand acres, and that it had marked a well-defined boundary on the exterior lines of its holdings. It further appears that the land here in question was embraced within the exterior lines of the twelve thousand acres claimed by the War Fork Land Company, and that for more than fifteen years before the institution of this action it was asserting title to the whole of the land within the lines of its boundary.

But this claim of adverse possession to all of the land within the lines of its boundary did not serve to put

it in the adverse possession of the land here in contro-
versy for these reasons: It is admitted that this land
until after 1914 was, at all times, wild, uncultivated, un-
improved and uninhabited land. There had never been
any settlement on it, or any actual adverse holding of
it by the War Fork Land Company, although it was,
and had been for more than fifteen years, in the actual
adverse possession of the other land within its bound-
ary to which it had good title. But its settlement on
and actual occupancy of the land to which it had good
title did not put it in the possession of this land to which
it had no title, nor did the inclusion of this land within
its marked boundary have the effect of extending its
adverse possession to it. This question, has been so
fully discussed, and thoroughly settled in the cases of
Whitley County Land Co. v. Powers' Heirs, 146 Ky.
801; and Brewer v. War Fork Land Co., 172 Ky. 598;
that we need not repeat here what was said in those
cases.

We think the judgment of the lower court, finding
that James Marcum was the owner of the land, was cor-
rect and' it is affirmed.