## Elliott et al. v. Elliott.

(Decided May 9, 1930.)

B. B. GOLDEN for appellants.

W. J. STONE for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS—
Reversing.

The appellant and defendant below J. N. Elliott and the appellee and plaintiff below, G. W. Elliott, are first cousins, and on February 8, 1921, the latter was engaged in the mercantile business in Pineville, and he appears from this record to have been in, at least, a reasonably prosperous financial condition. He had a son-in-law by the name of Bolton, who resided with him and who kept his books in connection with his mercantile business, and Bolton also acted as agent for one T. C. Hughes, who managed and operated a similar mercantile business for the Kentucky-Collieries Company which was conducted in a building owned by plaintiff in a ' suburban village of Pineville about one mile from the location of plaintiff's business house in that city. On the day and date mentioned, through the negotiations of Bolton, the stock of merchandise theretofore managed and operated by Hughes was sold for the price of $1,500, $500 of which was paid to Hughes, less Bolton's commission for effecting the sale, and two notes of $500 each jointly signed by plaintiff and defendant J. N. and G. W. Elliott. The business was conducted thereafter in the firm name of "J. N. Elliott & Co." until some time in 1925, when it was attached or levied on under executions by creditors of J. N. Elliott & Co. and sold thereunder. Some of the creditors of the defunct firm later brought suit on a return of "no property found" and attacked the conveyance of some real estate made by J. N. Elliott to his wife the appellant Laura Elliott. Prior thereto plaintiff filed this ordinary action against defendant in the Bell circuit court, and alleged in his petition that defendant was indebted to him in the principal sum of $838, with interest, and which was composed of these items: $300 paid by plaintiff as the balance due on the two $500 notes that he and defendant signed at the time the stock of merchandise was purchased; $250 cash paid by plaintiff as half of the cash payment made on that purchase, but which plaintiff alleged was advancement as a loan to defendant, and $288 alleged rent of the building in which the business of J. N. Elliott & Co. was conducted from the time it was purchased until it closed, and which was at the rate of "about $12.00 per month" according to plaintiff's testimony.

The answer (which was made a counterclaim) denied all of the items of the alleged indebtedness sought to be recovered by plaintiff, and alleged that plaintiff was all the while a partner in the business and was the "Company" in the firm name of "J. N. Elliott & Co.," and a settlement of the firm's business was sought by the counterclaim. Following pleadings made the issues and the cause was transferred to equity and consolidated with the creditors' equity suit, and upon final submission after proof taken, the court adjudged that there was no partnership, and that defendant was indebted to plaintiff as alleged in the latter's petition, but for some unknown reason no judgment was rendered for the alleged rent of $288, but one was rendered for the other items set out in the petition, i. e., the $300 balance on the two $500 notes originally executed for the purchase of the stock, and the $250 cash paid by plaintiff at that time also as a part of the purchase price. Some of the land involved was ordered to be sold, and plaintiff was given a preference because he procured an attachment upon the filing of his action which was prior to the creditor's suit, and to reverse that judgment defendants and appellants prosecute this appeal.

The only question involved is one of fact, and in determining it we are confronted at the threshold with the finding of the trial court, which, under the prevailing rule in this jurisdiction, will not be disturbed by this court if we entertain no more than a doubt as to its propriety or correctness. However, under that rule we are at liberty to reverse such finding if it reasonably clearly appears that it was made contrary to the preponderance of the evidence, and the conclusions naturally to be drawn from the circumstances in the case.

Plaintiff testified quite positively in his direct testimony that he was not a partner in the business, although he owned the building in which it was conducted; that he made the cash advancement, which was done by check payable directly to Hughes, as a loan to defendant J. N. Elliott, but he nowhere testified that the latter made any promise to repay it, and the only one relied on is that which the law would imply if the facts were as plaintiff contends. Plaintiff also testified that he signed the notes as surety, but the only one produced at the trial and which was a renewal one did not sustain him, since it was signed

personally by both of the parties without any attached descriptive word of the capacity with which they did so. Neither did plaintiff at the beginning of the business nor afterwards fix any monthly rental, and it is a significant fact that at no time during the four years the business was conducted did he attempt to collect from defendant any rent whatever. When defendant vacated the house, to which he built an addition while conducting the business, he turned over, according to his testimony, a lot of accounts to plaintiff, at least one or two of which were afterwards collected by him, but plaintiff denied the fact of making any such collections, and stated that without examining the accounts he concluded they were of no account and he threw them in the wastebasket.

Shortly after the ceasing of the business, plaintiff went to the store and took charge of whatever was left therein, a part of which was a stove and some papers relating to the business, one of which, according to the undisputed testimony of defendant, was a written contract, or bill of sale, executed by all the parties at the time the business was originally purchased, and defendant did not deny that such a writing was among the papers that he found in the store and took possession of after the buisness was closed, nor did he anywhere deny having signed any such writing as a purchaser of the store as testified to by defendant. It also appears, and is admitted by plaintiff, that he bought and paid for the first bill of goods put into the store after the business was purchased from Hughes, and he admitted that he either procured his son-in-law Bolton, and perhaps went along with him, to inspect the stock of merchandise while the business was being operated and which he now says was in connection with making out his income tax report; but what that had to do with his income if he was not a partner in the business is not explained and is somewhat obscure to us.

It is also significant that plaintiff took no legal steps to collect his alleged debt from defendant at any time during the four years of the continuance of the business, but waited until it blew up and the stock of goods was exhausted and until after a number of the creditors had brought suit, in some of which he was made defendant and judgment actually rendered against him, as testified to by defendant and not denied, but in effect

admitted by plaintiff, although in others he denied that he was a member of the firm and seems to have been successful. The point is that in so waiting he failed to pursue the ordinary course of a mere creditor wholly disconnected from any business associations with his debtor, and did not do so until it became apparent that he was going to be made liable for the debts of the firm, as well as lose the amounts advanced by him, unless he took action to establish his nonconnection with the firm.

Bolton testified in a somewhat vague manner. He denied in a way that his father-in-law was a half purchaser of the stock, but he admitted talking with him about it, and also admitted that he approached defendant, as the agent of Hughes, to sell the stock; but, when cross-examined upon vital points testified to by defendant, as to what occurred during the negotiations for the purchase, his recollection became faulty and he would answer: "I don't remember." Some of those vital points had been told by defendant and they were that he (defendant) agreed to and would purchase the stock jointly with plaintiff if the latter would assist him, and to run and operate the business in the firm name which was done, and that, in consideration of his services in doing so, he was to be permitted to maintain himself and family out of the store, and plaintiff was to furnish the latter free of rent to the firm and with the permission for plaintiff and his family to live in a part of the store, all of which was done during the four years of the operation of the business. Bolton was also interrogated about some conversations between plaintiff and his wife with reference to the interest of her husband in the business, and his recollection with reference thereto was equally impaired; but he corroborated defendant in the latter's testimony that there was a written contract of sale of the stock of merchandise by Hughes when it was originally purchased by the firm of J. N. Elliott & Co., but he stated that he did not know by whom it was signed.

Plaintiff also admitted and stated that defendant prior to the purchase of the stock had served him as clerk in his store in Pineville, from which it should be inferred that he was familiar with defendant's qualifications to operate a store of the kind and quality purchased. He also stated that he had never theretofore signed any notes for defendant or accommodated him in any manner

as he now claims he did at the time the stock of merchandise was purchased from Hughes and to enable defendant to make it. He evidently then, if his version is true, did not furnish to defendant such accommodations because of having theretofore done so, or from the customary habit of extending such friendly favors.

Defendant testified positively, unequivocally, and in a straightforward manner that plaintiff was a partner in the purchase of the stock of merchandise and agreed to and did pay one-half of the cash consideration, and to the other terms of the contract relating to the management and conducting of the business and which appears to have been done in that manner without any objection or protest on the part of plaintiff, until it was found that he would lose much more by the establishment of the partnership than if it was not so done. One disinterested witness (a wholesale dealer) testified that plaintiff told him that he was interested in the business "in a way," and another one testified that plaintiff told him that a part of the goods were his.

There are many other circumstances proven in the case entirely at variance with usual and ordinary conduct, unless plaintiff was a partner, and which are strongly persuasive that defendant was and is correct in his contention that there was a partnership; and when we add to them the facts hereinbefore referred to, the most of which are wholly undenied and some of which are expressly admitted, we are forced to the conclusion that the great preponderance of the testimony in the case was to the effect that a partnership existed, and that the court erred in holding otherwise and in rendering the judgment he did, based upon such erroneous finding.

Wherefore, the judgment is reversed, with directions to set it aside and to adjudge that plaintiff, G. W. Elliott, was a member of the firm of J. N. Elliott & Co., and to sustain defendant's motion to refer the case to the master commissioner to make a report of the condition of the partnership business with a view to a settlement thereof, and for other proceedings consistent with this opinion.