## Wilder v. Lee.

February 28, 1947.

J. S. Forester, Judge.

W. T. Davis and Logan E. Patterson for appellant.

W. L. Hammond and Cleon K. Calvert for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Reversing.

Appellee, John M. Lee, filed a petition in equity against appellant, Grant Wilder, in the Bell Circuit

Court in which he averred that he was the owner in fee and in the actual possession of a tract of land which his pleading described by metes and bounds but did not give the number of acres; that Wilder was claiming the land and Lee asked that his title be quieted against Wilder's claim. The answer, after traversing the averments of the petition, described a boundary of 150 acres as belonging to Wilder and alleged that the land set out in the petition was included in this 150 acre tract and Wilder asserted paramount title to the tract described in the petition. After considerable proof was taken by depositions, the chancellor adjudged the title of the land in dispute to be in Lee, and Wilder appeals.

The land in controversy is on Coal Stone Branch of Brownie Creek and Wilder deraigned his title through a patent of 400 acres which William Duff Miracle obtained from the Commonwealth. Before his death William divided his land among his four children, one of whom was Abraham J. Miracle, who received from his father the land now claimed by Wilder. Abraham lived on this tract until July 8, 1920, when he was accidentally killed by falling from a tree. He left no will and was survived by his widow, Emily, and six children.

J. Levitt acquired the interests of Abraham's six children in his land, subject to the dower of the widow, Emily, and Sarah Turk obtained Levitt's interest therein by a deed dated Jan. 15, 1923. The widow, Emily, died in August 1933, which gave Sarah Turk complete title to the land, and on Sept. 13, 1933, her Committee, pursuant to the approval of the Bell Circuit Court, conveyed it to Wilder.

Appellee, Lee, claims title through a tax deed executed to him on Oct. 6, 1919, by Robert L. Green, Auditor of the Commonwealth. Also, Lee claims title by adverse possession. He and his brother, Levi, testified that Lee held this land through his tenants, Emily Miracle and her son Gillis, from January 1920 until shortly before beginning this action. It is further insisted by Lee that as he was in possession of the land by his tenant, Gillis Miracle, when Wilder obtained his deed in 1943, the latter took no title because his deed is void under the champerty statute, KRS 372.070.

Lee obtained no title to this land by virtue of the

tax deed he received from the Auditor, for the reason that the Auditor's deed recited that the land it conveyed had been assessed in the name of J. M. Lee, which was an erroneous statement. Furthermore, this tax deed described the land as being in Magisterial District No. 5, when the uncontradicted proof is that it was in the Third Magisterial District. These two errors made the tax deed void and Lee took nothing by virtue of it. Hogue v. Gibson, 162 Ky. 813, 173 S. W. 138; Jones v. Johnson, 223 Ky. 478, 3 S. W. 2d 1064.

The contention of Lee that Wilder accepted a conveyance to this land while Lee was in adverse possession thereof through his tenants, therefore Wilder's deed is void under the champerty statute, KRS 372.070, is without merit. It is the settled rule in this jurisdiction that the champerty statute does not apply to judicial sales. Noble v. Hubbard, 286 Ky. 100, 149 S. W. 2d 775, and authorities therein cited. But Lee insists that when Sarah Turk conveyed this land to appellant, through her Committee with the approval of the Bell Circuit Court, such was not a judicial sale which took the transaction out of the champerty statute. This question has been decided adversely to appellee's contention in the recent case of Landers v. Scroggy, 294 Ky. 848, 172 S. W. 2d 557, where it was held that a sale under KS sec. 2150a, now subsection 8 of sec. 489 of the 1946 Pocket Supplement to the Civil Code of Practice, is a judicial sale. This section is the one under which the sale of Sarah Turk's land was made when appellant became the purchaser.

This brings us to the question of whether or not Lee has held this land by adverse possession for 15 consecutive years from the time he claims to have taken possession of it in January 1920, following his obtaining a tax deed to it on Oct. 6, 1919.

Appellee, John M. Lee, testified that on Jan. 12, 1920, he entered into a written contract with Gillis Miracle wherein he leased this land to Gillis for $12 a year and that Gillis occupied it as his tenant under this lease until December 1943. That this contract was prepared in John Lee's home and the signature of Gillis (which was by mark) was witnessed by Lee's wife. Subsequently, John Lee gave rather contradictory testimony

to the effect that he went up to Gillis' place in January 1920 "and signed up with him." Levi Lee, a brother of John, testified that the lease with Gillis was made at Gillis' home on the property and it was not in the winter time, as John testified, but in the late summer or early fall. Gillis denied that he entered into this lease contract with John.

Both John and Levi testified that Gillis occupied the place continuously and was never off of it after he rented it from John. However, Gillis' testimony is that upon returning from the army in 1919, he lived with his brother-in-law, Josh Lee, for a year. Then he came back to the home place where he lived with his mother for one year, after which he moved to a house on the back of the ridge for a year where he became involved in a little liquor trouble and went to jail for six months. Upon being released from prison, he again went to live with Josh Lee. Gillis married on Feb. 11, 1932, and he and his wife lived with his mother a short while and then moved to Hillary Wilder's place where they lived for two months; then they went to the Harrison Cupp's place for something like nine months. When Gillis' mother died in August 1933, he and his wife returned to the home place where they lived for about a year and then moved to the Vick Wilder place where he remained for some nine months. He then returned to the home place where he lived until appellant bought it. Various parts of Gillis' testimony as to his moving from place to place and the time he remained at each are supported by the testimony of his wife; T. J. and Dan Cupp; Josh, Henry and W. G. Lee and Laura Wilder. While Dillard and Leonard Green, and John B. and Amanda Lee add practically no strength to the weak testimony of John M. Lee and his brother, Levi.

Evidently, appellee sensed the frailty of his contention that he held the land through Gillis as a tenant, because he next argues that Gillis' mother, Emily, occupied the land as his tenant continuously from 1920 until her death in August 1933, from which latter date Gillis took possession as his tenant. The weakness of this position is that Emily was occupying the land not as tenant of appellee but under her right of dower in the land of her deceased husband, Abraham. But admitting arguendo that she did occupy the land as tenant of Lee from Janu-

ary 1920 until her death in August 1933, this was only 13 years. And the proof is that Gillis lived on the place only one year after his mother's death before moving to the Vick Wilder place, where he lived for about nine months before returning to his mother's home place. This interim of nine months broke the continuity of the adverse possession that appellee claims through Emily and Gillis as his tenants before the statutory period of 15 years had run. In the eyes of the law the true owner stepped back into the possession when this break occurred and the disseizor must start all over again and hold adversely for 15 continuous years before he can obtain title by adverse possession. Flinn v. Blakeman, 254 Ky. 416, 71 S. W. 2d 961.

We cannot determine from the chancellor's judgment in favor of appellee whether it was based upon the tax deed or whether he was under the impression that appellant's deed was champertous, or whether his decision was based on appellee's purported adverse possession. Whatever line of reasoning induced the chancellor to reach the conclusion he did was erroneous. The rule is that in equity cases this court gives weight to the chancellor's finding, yet we always reserve the right to weigh the evidence ourselves and when convinced the chancellor's finding of fact is contrary to the preponderance of the evidence, we do not hesitate to reverse his judgment. Reiss v. Wintersmith, 241 Ky. 470, 44 S. W. 2d 609; Elliott v. Elliott, 234 Ky. 257, 27 S. W. 2d 963; Buckner v. Buckner, 295 Ky. 410, 174 S. W. 2d 695. We are firmly of the opinion that the evidence shows Lee did not hold this land in adverse possession for 15 continuous years through tenants and if the chancellor based his judgment on this ground, the facts do not support it. We have heretofore seen that the tax deed was void under which appellant claimed, also that the champerty statute does not apply to the deed under which appellee claims as it was executed pursuant to a judicial sale. As appellant showed a good paper title to this land back to the Commonwealth and as appellee did not hold it adversely for 15 continuous years, the chancellor should have adjudged appellant to be the owner of the land.

The judgment is reversed with directions that one be entered adjudging that appellant has title to the land in controversy.