## Terry, et al v. Loudermilk.

(Decided March 27, 1914.)

### Appeal from Whitley Circuit Court.

1. Ejectment—Patents—Exclusions—Evidence.—In an action of ejectment, evidence for the plaintiffs examined and held suffi-

cient to show that the land in controversy was not covered by the exclusions in the patent under which they claimed.

2. Ejectment—Adverse Possession—Continuity.—In asserting a title by adverse possession, continuity of possession must be shown.

3. Ejectment—Adverse Possession—Continuity—Evidence.—In an action in ejectment, evidence examined and held insufficient to show continuity of possession on the part of the claimant by adverse possession.

4. Ejectment—Adverse Possession—Well Marked Boundary—Evidence.—In an action in ejectment, evidence examined and held insufficient to show that defendant claimed to. a well marked boundary.

5. Ejectment—Adverse Possession—Instructions.—An instruction on adverse possession authorizing a finding for defendant if he "held and claimed the land in controversy to well marked and clearly defined lines and boundaries, openly, notoriously, exclusively, continuously, uninterruptedly, visibly and adversely," is not proper; the expression, "actual, open, notorious, continuous, adverse and peaceable possession" should be used.

HENRY C. GILLIS for appellants.

R. S. ROSE and P. W. HARDIN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

In this action of ejectment, James E. Terry and others seek to recover of defendant, James Loudermilk, a tract of 75 acres of land, situated in Whitley County, Kentucky. Defendant denied plaintiffs' title, and pleaded title by adverse possession. The jury returned a verdict in favor of the defendant. Judgment was entered accordingly, and plaintiffs appeal..

Plaintiffs introduced a patent from the Commonwealth to Alfred L. Clapp, dated June 23, 1874. The patent covers 59,560 acres. There are excluded from the patent 23,180 acres, leaving a balance not covered by exclusions of 36,340 acres. At the trial it was stipulated that plaintiffs were the owners by a regular chain of conveyances of the land embraced in the Clapp patent. G. W. Sproule, who had been engaged in surveying land in Whitley and the surrounding counties for a period of 30 years, testified that he did the surveying for Hill and Archer, through whom plaintiffs claim, for a period of about two years. His purpose was to ascertain what portions of the Clapp patent were covered by older patents. In doing this he made surveys of the old patented

lands. He examined the records in the surveyor's office, and also examined the old records and deeds. Mr. Hill also furnished him the papers from the patent office at Frankfort. He endeavored to get papers for all the surveys he could hear of. In doing this work he worked on the boundary from Clear Fork to the county line. On the south side it was bounded on what was known as the Morgan-O'Bannon survey. He surveyed practically all the land between Duck Run and the Cumberland river. He ran the line of all the surveys that adjoined the land in controversy. The land in controversy is at the head of Duck Run. In doing the work he did not get information that there was any survey older than the Clapp patent. As defendant did not undertake to show that the land in controversy was covered by any patent older than the Clapp patent, we conclude that the evidence for plaintiffs on the question whether or not the land in controversy was included within any exclusions from the Clapp patent was sufficient to make out a *prima facie* case in favor of plaintiffs. Steele v. Bryant, 132 Ky., 569; Cornett v. Birchfield, 142 Ky., 359.

The next question is: Was defendant's proof of adverse possession sufficient? He testified that he claimed the land under a survey made in 1883 in the name of Milford White and James Loudermilk. He obtained a deed from White about a year before this suit was brought. Neither the survey nor the deed is introduced in evidence. What land is covered by them does not appear. It is not shown that any patent was ever issued on the survey of 1883. Defendant testified that he placed Frank Ball on the land 18 or 19 years before he testified. Frank Ball built a house and cleared four or five acres, which were fenced. Defendant rented the property for a while, and after the fence burned he made ties and spokes of it. He lived on the adjoining land, and permitted his stock to run on the land in controversy. The next house built on the land was built about 12 years before he testified. This was built by Jess White. Jess did not stay there long. Defendant himself built a house about one year before he testified. There was a clearing around this of about a half acre. On being asked to what exterior lines he claimed, witness said "I will tell it the best I know." He was then asked "What does it begin on?" His reply was: "On a post oak, runs west and corners on two pines,

and then turns north and corners on a beech on bank of branch and from that point east and calls for a stake on John Loudermilk's survey, and thence to the beginning.''

On cross-examination, defendant testified as follows: ''Q. What marked trees between that corner and the second corner—from the post oak to the two pines? A. I don't know. Q. Are there any? A. I don't remember. Q. How long has it been since you seen any marked trees along that line? A. Just a short time since I seen the corners. Q. I am talking about line trees. A. I don't know. Q. That line is half a mile long? A. I think so. Q. Could a person go there and follow that line without a surveyor? A. Yes, I can. Q. Why? A. Because I am acquainted with it and know where it is. Q. The next line between the two pines and the black oak, any marked trees there? A. I don't know, I just know the corner trees. Q. Is that all you know? A. I could go the line very easy if I was a mind to. The last is from the John Loudermilk survey back to the beginning—follow the old line and turn back a south course to the beginning. Q. Following the old John Loudermilk survey? A. Yes. Q. That is the tract where you have been living? A. It adjoins it. Q. You have not been living on that tract? A. I gave it to my boy. Q. How long ago did you give it to one of your boys? A. 12 or 15 years ago. Q. How much did you give to your boy? A. I don't know, about 75 acres.''

Defendant also stated that Frank Ball lived on the land two or three years, and then took his house off. Defendant then rented the land two or three years, and the fence got burned down. It had been 15 or 16 years since the fence burned. After the fence burned down that part of the land was not cultivated. It grew up. There were two mills on the land. The first mill was put there 12 or 13 years ago. When the mill was removed George Davenport stayed there about one year. The house was then taken down. It was then 10 or 12 years before any other house was built. Defendant cut timber on the land and also let his stock run on it.

It will be observed that on the question of the continuity of defendant's possession, the evidence for the defendant is to the effect that Frank Ball built a house on the land about 18 or 19 years ago, and cleared and fenced four or five acres. Three or four years later

Ball removed the house and the fence burned down. The land was then vacant until about 12 years ago, when a saw mill was operated on the land. At the same time Jess White built a house to live in while working the mill. This house was on the land only about a year. There was no clearing around this house. After this house was removed the land was again vacant for ten or twelve years, with no house, fencing or clearing on it. A year or more before suit was filed, defendant built another house, and cleared from a half to three-quarters of an acre. In the meantime, defendant let his stock run on the land, and cut timber from it. We have frequently held that a title asserted by virtue of adverse possession cannot be maintained unless there has been a continuity of possession. Defendant himself did not live on the land. The possession by his alleged tenants was frequently broken. There were periods from a year to ten or twelve years when nobody was occupying the land. Clearly the defendant's possession was not continuous. Overton v. Overton, 29 Ky. L. R., 743; Courtney v. Ashcraft, 31 Ky. L. R., 1326; Sparks v. Jackson, 142 Ky., 18.

It was incumbent upon defendant to show that he claimed to a well-marked or well-defined boundary. He failed to prove that he held under any conveyance defining the boundary. That being true, he should have proved possession to a well-marked boundary. While he refers to the fact that some corner trees were marked, and that he himself could go around the line, he fails to show that there was a well-marked boundary around the land which he claimed. The purpose of such boundaries is to put the legal title holder on notice. It is not sufficient that the claimant by adverse possession may be able to go around the boundary which he claims. Here there were large gaps where there were no marked trees at all. The legal title holder going upon the land could not tell the extent of defendant's claim. The evidence utterly fails to show a well-marked boundary.

As plaintiffs proved a legal title to the land, and as the evidence for the defendant was insufficient to show title by adverse possession, the court should have instructed the jury to find for plaintiffs.

In view of the fact that the evidence may be different on another trial, we deem it proper to say that the instruction on adverse possession is not proper. It authorizes a finding for defendant if he or those through

whom he claimed had for fifteen years or more next before the filing of the petition "held and claimed the land in controversy to well marked and clearly defined lines and boundaries, openly, notoriously, exclusively, continuously, uninterruptedly, visibly and adversely." It is well settled that actual posession in a case of this kind is absolutely necessary. The jury might have concluded that defendant "held" the land in controversy if he occupied the adjoining land and occasionally cut timber from or let the stock pasture on the land in controversy. The jury, therefore, is much less liable to err if the stereotyped expression "actual, open, notorious, continuous, adverse and peaceable posession" is used.

Judgment reversed and cause remanded for new trial consistent with this opinion.