## Flinn et al. v. Blakeman et al.

(Decided March 2, 1934.)

(As Modified on Denial of Rehearing June 1, 1934.)

418

MARTIN T. KELLY for appellants.

H. H. OWENS and G. M. MANNING for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Robert L. Blakeman, by petition, filed March 30, 1929, asked to have his title quieted to 12,000 acres of land, he was accorded that relief and James H. Flinn and Mary F. Stevens have appealed.

Blakeman made the appellees James H. Flinn, Mary F. Stevens, Elisha Vaughn, Granville Delph, and Martha Delph defendants. Granville Delph in his answer disclaimed any interest in the land except that he declared he occupied it as tenant of Flinn and Stevens. Flinn and Stevens filed seven paragraphs of answer. The first is a traverse of the petition, the second is a plea of ownership in themselves of 2,400 acres of land or thereabouts which they described with particularity and to which they asserted title by adverse possession, and by counterclaim sought judgment establishing their title to it. The third paragraph was an attack upon the forfeiture proceedings through which plaintiff derived his title. The fourth paragraph was a denial that the 12,000-acre tract included the tract to which Flinn and Stevens asserted title. The fifth paragraph was a plea of champerty. The sixth paragraph was simply the third paragraph stated in different language, and the seventh paragraph was a defense under section 4076g, Ky. Stats. They asked that the petition be dismissed and that they be declared the owners of the land they had so particularly described.

Four months later they amended their answer and made Thos. D. Tinsley, C. P. Keenedy, and G. M. Manning parties. These three, as well as Elisha Vaughn and Martha Delph, appear to have done nothing and they filed nothing. Blakeman traversed the answer of Granville Delph and the answer of Flinn and Stevens by reply. Some two years later Flinn and Stevens withdrew, from their answer, their counterclaim and left it a defensive pleading only.

### Plaintiff's Title.

On August 19, 1784, by virtue of treasury warrants 21400 and 21440 issued December 19, 1783, James Jenkins made entry of 12,000 acres of land to be laid off adjoining Samuel Overton's entry.

On April 23, 1786, there was surveyed for James Jenkins 12,000 acres of land lying and being in the county of Lincoln on the waters of the south fork of Kentucky river adjoining Samuel Overton's survey of 10,000 acres on the south and bounded as follows: Beginning at Overton's S. E. corner at a black oak tree corner to Overton, thence with Overton's line W., 1,264½ poles to a white oak, Overton's S. W. corner, thence S. 1,518½ poles to 2 white oaks, thence E. 1,264½ poles to a white oak and dogwood, thence N. 1,518½ poles to the beginning.

September 27, 1786, Jenkins assigned this survey to Maurice Nagle and on July 24, 1787, a patent for that tract was issued to Nagle by the state of Virginia.

On May 8, 1919, the commonwealth's attorney for the Thirty-fourth judicial district began an action in the Knox circuit court to forfeit to the commonwealth the Nagle title to that land for nonpayment of taxes and such proceedings were had that the title was forfeited and the land sold, at which sale it was purchased by C. P. Kennedy who on May 6, 1920, in open court, acknowledged transfer of his purchase to R. L. Blakeman, whereupon the master commissioner was directed to and on the following day did make and deliver deed conveying that 12,000 acres to Blakeman.

### Defendant's Title.

Defendants asserted and sought to establish that Campbell Smith had lived on and exercised ownership over this 2,400 acres from 1870 to April 13, 1891, when he sold it to Churchill, who, on March 5, 1892, sold it to Kentucky Mineral & Timber Company, which was sued by Campbell Smith upon the purchase-money notes, and, as a result, the land was reconveyed to Smith on June 12, 1895; that on December 15, 1895, he conveyed it to R. C. Ford, who on October 3, 1910, conveyed it to Mary T. Garrard; that on July 24, 1911, she conveyed it to Elisha H. Flinn upon whose death in November, 1911, it passed to Jas. H. Flinn and Mary F. Stevens, his only children and heirs at law.

Thus we find Blakeman has the paper title and this forces Flinn and Stevens to take the laboring oar and in some way overthrow Blakeman's title or else to show that they and their predecessors in title have as disseizors ousted Blakeman and his predecessors in title.

The Burden of Proof.

In saying what we have just said we are not un-aware of things we have said in former opinions. "In Kentucky Union Company v. Commonwealth, 128 Ky. 610, 108 S. W. 931, 110 S. W. 398, 33 Ky. Law Rep. 9, 49, 587, one of the very first cases which arose under the Forfeiture Act, this court said: 'The doctrine of caveat emptor applies in this, as in other proceedings. And the purchaser, and not the occupant, as argued by counsel for appellant, would be required to show in actions to recover under his purchase, that the land claimed by him was not of the excluded class.'

"The opinion in the Kentucky Union Case was followed and approved in Davidson v. Lewis, Judge, 159 Ky. 798, 169 S. W. 538, and after quoting the language above set out made this further remark respecting a purchaser under the Forfeiture Act: 'If he (the purchaser at the sale) attempts to dispossess any of them (the occupants), as he may do, in an action brought directly against them for that purpose, he must show, as said in the Kentucky Union Case, 'that the land claimed by him was not of the excluded class.' "

Flinn and Stevens are relying on these expressions.

Now let us look at those cases. In the first case the court succinctly states the questions involved are:

"[1] Is article 3 of the Revenue and Taxation Act, approved March 15, 1906 [Laws 1906, c. 22], a constitutional exercise of legislative authority? [2] Is the judgment erroneous, in that the petition fails to allege or the judgment to ascertain the various persons who had occupied and paid taxes on lands within said 40,000-acre boundary for five years next preceding the judgment of forfeiture? [3] Did the court err in entering judgment of sale at the same term of court at which the judgment of forfeiture was entered?"

The binding authority of that opinion must be found in the court's answer to those questions. We are not now concerned with the answer to question 1. The court in answering question 2 said:

"Appellant contends that, if the act is constitutional, the petition is defective, and that the general demurrer thereto should have been sustained, because the petition fails to disclose what parts, if

any, of the land described in the petition, is held by occupants who have paid taxes thereupon for the five years preceding the judgment of forfeiture; and that the judgment is erroneous because it does not segregate the parts to which the forfeited title would inure. So far as disclosed by the record, there is no part of the tract held by occupants. But the court judicially knows, and it was admitted in argument, that practically, if not quite, all the land described in the petition is adversely held by occupants under claim or color of title. The record shows only that the appellant is the owner or claimant of the title to the tract of land, which is specifically described by metes and bounds, courses and distances, and that appellant has failed to comply with the provisions of the article with respect to the listing of it for taxes and the payment of taxes thereon. The petition contains all the allegations necessary to show that appellant was delinquent, and its title subject to forfeiture, and the demurrer thereto was therefore properly overruled. Nor is the judgment erroneous on that ground. Certainly the title to the tract of land described in the petition, and which is adjudged to be subject to forfeiture and sale, can be sold by the same description, the purchaser taking that which, under the article, passes at the sale.''

When that was written the court had decided the question before it. The court, however, continued writing, and in the subsequent part of the opinion wrote the part cited above upon which Flinn and Stevens rely. It was pure dictum, and the court in writing it was attempting to decide cases that might thereafter arise between occupying claimants and the vendee of the title of the Kentucky Union Company when it was sold after forfeiture.

We will now take up the second case, Davidson v. Lewis. That was an original proceeding in this court, for a writ of mandamus to compel Judge Lewis to enter judgment in two cases pending before him. The same situation existed in each case. All this court had to do was to say to Judge Lewis that he must enter judgments in each case. It could tell him he must make a decision in each case, but it had no power under its original jurisdiction to tell him what sort of a judgment he should enter. So long as the judge was proceeding

within his jurisdiction, all this court could do was to compel him to act. It could not control his discretion by telling him what to do. Williams v. Howard, 192 Ky. 356, 233 S. W. 753; 38 C. J. p. 634, sec. 139; 18 R. C. L. p. 299, sec. 232.

So much therefore of the opinion in the Davidson Case as required Judge Lewis to take action is the whole of the binding effect of that decision, and those parts of that opinion dealing with questions that might thereafter arise in actions to be thereafter brought is only dictum and the part of that opinion upon which Flinn and Stevens are relying thus loses its force. The listing of this land for taxation and the payment by Flinn and Stevens of the taxes levied thereon for more than the five years requried by section 4076g, Kentucky Statutes, is admitted, but the proof clearly shows that at the time of the forfeiture Flinn and Stevens had not been in actual adverse possession thereof for five years. That certainly was as far as Blakeman had to go. He did not have to show that any of the other men, women, children, or corporations in the world were not in possession of it as seems to be contended by Flinn and Stevens. To so hold would be absurd. If, however, Flinn and Stevens had come forward with a plea and satisfactory proof that John Doe, Richard Roe, or any one else had had actual adverse possession for five years next before the judgment of forfeiture, and had listed this land for taxation during those years and paid the taxes levied thereon for that time, they could thereby have defeated Blakeman, for Blakeman must recover upon the strength of his own title; but after Blakeman exhibits his paper title and shows Flinn and Stevens had not had five years' actual adverse possession, previous to the judgment of forfeiture, the burden of showing title in themselves derived from some other means than the operation of section 4076g, Kentucky Statutes, is on Flinn and Stevens, so we will examine their efforts to sustain it.

### Stipulations in the Record.

"It is stipulated that the Maurice Nagle Patent for 12,000 acres, surveyed April 3, 1786, covers the whole of the boundary described in plaintiff's petition, and that the title to said land was forfeited at the September term of the court 1919, December 19, 1919, in Knox County, Kentucky, by virtue of forfeiture proceedings instituted by the Commonwealth of Kentucky

under the Act of 1906, section 4076b to section 4076k; that pursuant to said proceedings, the lands, except those excepted by the Act, were sold, at which sale, R. L. Blakeman became the purchaser." That Campbell Smith lived in his house at the mouth of Glade branch continuously from 1870 to 1891 when he sold out.

"That the defendants James H. Flinn and Mary F. Stevens are the only children and heirs at law of Elisha H. Flinn, deceased, and that the title to lands claimed by them in this action descended to them under the laws of descent and distribution of the State of Kentucky, if any title they have which the plaintiff denies.

"That the said named defendants listed and paid taxes on the lands claimed by them in this action for the five years next preceding the date of the forfeiture of the title claimed by plaintiff under the proceedings in the Knox Circuit Court in the case of Commonwealth of Kentucky v. Maurice Nagle and the tract of land named in said suit and referred to in plaintiff's testimony, and has listed and paid the taxes thereon since 1910.

"That the defendants have a record title from the Commonwealth of Kentucky to such patents claimed by them as covers any parts of the land in controversy which are shown by deeds duly recorded in the proper offices, but that each of said patents under which the defendants claim title are junior in date to the patent under which the plaintiff claims title, if said patents confer any title.

"That defendants have a connected chain of title of record under the patents mentioned in this stipulation, if any title they have, which plaintiff denies.

"That the location of the Maurice Nagle patent for 12,000 acres covers the land involved in this action."

### Suing in Equity.

Blakeman instituted this action in equity to quiet his title. That is permissible under section 11, Ky. Stats. Evidently Blakeman prepared his petition with the statutes open before him, for he alleged therein:

"The plaintiff, Robert L. Blakeman, says that he is the owner of, having the fee simple title to and is in the actual possession of all the hereinafter described boundary. * * *"

He followed that allegation by a careful description

of the 12,000-acre tract, by reference to the waters on which it lay and by its metes and bounds. This is copied from the answer filed thereto:

> "The defendants, deny that the plaintiff, Robert L. Blakeman, is the owner of or has a fee simple or any title to or is in the actual or any possession of all or any of the boundary of land described in his petition herein, where same conflicts with or is embraced or covered by the land described in the second paragraph of this answer and counterclaim, and deny that said plaintiff is the owner of any of the land described in the second paragraph of this answer where same covers and embraces the land described in plaintiff's petition."

This was followed by an elaborate description (over 8 pages) of the 2,400-acre tract. This plea is a negative pregnant, see 49 C. J. p. 269, sec. 335, and its effect is to raise no issue as to the ownership or possession of any part of the 12,000-acre tract except the 2,400-acre tract. See 49 C. J., p. 270; 21 R. C. L. 560, sec. 119. The situation would not be different if the defendants had said, "We admit you own the rest of your 12,000 acres and are in actual possession of it, but here is 2,400 acres you do not own and of which you are not in possession."

Plaintiff's allegation of ownership and actual possession of his 12,000 acres are material allegations; see section 11 Ky. Stats., and cases there cited. This case comes within none of the exceptions to section 126 of the Code of Practice in civil cases, therefore this case is governed by the provisions of section 126, and it provides:

> "Every material allegation of a pleading must, for the purposes of the action, be taken as true, unless specifically traversed."

Those provisions are mandatory; see Rose v. Cecil, 167 Ky. 608, 181 S. W. 170. Section 126 applies to equitable as well as ordinary actions. See Clarke v. Seaton, 57 Ky. (18 B. Mon.) 226. Therefore it must be taken as true that the plaintiff does own and is in the actual possession of all of this 12,000 acres except the 2,400 acres. Then this which is taken from Turner v. Bowens, 180 Ky. 755, 203 S. W. 749, 751, settled conclusively Blakeman's right to maintain his suit in equity:

> "Nor does the statute mean that the party who

brings a suit to quiet his title must be in actual physical possession of the particular piece of land to which he wants his title quieted. It is true that he must be in the actual possession of the land, but if he * * * is in actual physical possession of another body of land, of which the land to which he wishes to have the title quieted is a part, then he will be in possession of it within the meaning of the statute. * * * It is well settled that, when a party is in the actual physical possession of any part of a body of land to which he has good title, * * * he is in the possession of the whole of it, and may bring a suit to quiet the title to any part of it.''

To the same effect is this which is copied from Williams v. Lowe, 175 Ky. 369, 194 S. W. 342, 343:

"The argument is made that Lowe could not maintain this action to quiet his title because he was not in possession of the land when the suit was brought. This contention is not well founded, however, because Lowe was in possession of all the land covered by his deed, and if this disputed land was within the boundary lines of Lowe's deed, he was in the posession of it within the meaning of the statute, and had the right to maintain an action for the purpose of quieting his title to any part of it against the claim of an intruder, such as Williams, who was asserting a hostile title to any portion of it within the boundary lines of the deed. * * * It is further insisted that as Williams had been in the actual possession of this little spot of ground for 3 or 4 years in the cultivation of crops, Lowe could not maintain an action to quiet his title to it, but must bring a suit in ejectment. In this contention we cannot agree with counsel. We think that if an intruder takes possession of land, claiming the right to do so in opposition to the title of the real owner, the real owner may bring a suit against the intruder to have his title quieted."

If Flinn and Stevens had any objection to the settlement of the issue between them and Blakeman by a court of equity, they should have made a motion to transfer this action to the common-law docket when they filed their answer. See section 10 of the Civil Code of Practice.

## Attacks on Plaintiff's Title.

The defendants have discovered in the deed by which the commonwealth conveyed this land to the plaintiff a statement of failure on the part of the unknown defendants, unknown owners, and unknown claimants to list said land for taxes and to pay the taxes due thereon to the state of Kentucky and Knox county for the years 1901, 1902, 1903, 1904, 1905, 1906, 1907, 1908, 1909, 1910, 1911, 1912, 1913, 1914, 1915, 1916, 1917, 1918, and 1919, under the provisions of sections 4076b to 4076k, both inclusive, of Kentucky Statutes.

The defendants have seized upon that and section 4030, Ky. Stats., and now argue that this land was sold for more taxes than were then due thereon hence, so they say, the sale so made is void, and they cite a number of authorites to that effect. The answer to that is this 12,000-acre patent was not sold for taxes, but the title thereto was forfeited to the commonwealth for the failure on the part of its owners to list it for taxation and to pay the taxes due on those assessments. After the title to it had thus been forfeited to and vested in the commonwealth, then this 12,000 acre patent was sold as required by section 4076h, Ky. Stats., and the plaintiff acquired this title through that sale. It may be argued that the commonwealth had no right in 1919 to forfeit this title for failure to list this land for taxation and failure to pay the taxes thereon in that year, but we have no evidence that was done. The proceedings by which this title was forfeited are not before us, and we have nothing to show for what this title was forfeited except the above statement in the deed made to Blakeman. To establish why and for what this title was forfeited it would be necessary to show the pleadings and issues in that forfeiture proceeding and that has not been done, and the presumption of the correctness of what the court did in that case must prevail.

## Deeds made by Blakeman.

In their answer Flinn and Stevens have alleged that on May 22, 1925, Blakeman conveyed to Martin Jones 100 acres of the land now in dispute and on December 24, 1928, Blakeman conveyed to Elisha Vaughn 99/100 of a tract of land (quantity not given) lying within the disputed boundary. By a judgment of the United States District Court for the Eastern District of Kentucky,

these deeds to Jones and Vaughn were held champertous and void and Flinn and Stevens were in that litigation adjudged as against Jones and Vaughn to be the owners of that land and their title thereto was quieted. Blakeman in that litigation testified for Jones and Vaughn, and Flinn and Stevens now complain because Blakeman was allowed to recover as against Flinn and Stevens his entire boundary, including these two tracts of land to which their title was quieted in the litigation in the federal court.

Blakeman was not a party to that litigation. He testified there in favor of Jones and Vaughn in support of the deeds he had made them, but by so doing he did not hurt his position here, for by section 213, Ky. Stats., he could have been compelled to testify. Those deeds were held void for champerty, and the effect of that judgment was to leave Blakeman with title as fully as if they had never been made. Crowley v. Vaughan, 74 Ky. (11 Bush) 517; Begley v. Erasmie, 205 Ky. 240, 265 S. W. 833.

Blakeman also made a deed to Willie Root on March 20, 1929, the parties sharply disputing the location of this land. For Flinn and Stevens it is contended it lies within the boundary claimed by them, and for Blakeman it is contended it does not. To correctly locate this land might be a matter of some difficulty, but we need not go into that. If it lies within the Flinn and Stevens boundary, then the deed was champertous and did not divest Blakeman of title; and if it lies without their boundary, then it is a matter of no concern to Flinn and Stevens.

### Section 490, Kentucky Statutes.

Among other things, this section of the statutes provides:

"The owner may convey any interest in lands not in the adverse possession of another."

Flinn and Stevens have seized on that and are arguing that this provision would prevent any representative of Nagle from making a valid deed to these premises while Flinn and Stevens were in adverse possession of them and that therefore the court could not by its commissioner convey them to Blakeman.

Let us consider for a moment whither this would lead us. A has a farm mortgaged to B for all it is

worth. In his desperation he abandons it and moves away. C moves in and takes possession of the farm, claiming it as his own. Now if Flinn and Stevens are correct in their position, the court would be powerless to sell this farm to produce money to pay the debt due B, so long as C's adverse possession continued. This clearly shows the fallacy of this contention.

## The Premature Judgment.

Flinn and Stevens have questioned the regularity of the proceeding under which this Nagle patent was forfeited and sold. They tell us the record shows the judgment forfeiting this title was rendered September 13, 1919; they then cite section 4076e, Kentucky Statutes, which clearly gave any one in privity with this Nagle title the whole of the twenty-four juridical days of the term of the court which began on November 24, 1919, in which to file counterclaims, etc., as contemplated by that section, and the judgment directing the sale was entered on Friday, December 19, 1919, which was the twenty-third day of the term. Flinn and Stevens contend this judgment should not have been entered earlier than April 5, 1920, which is true, and this judgment was entered prematurely, which was a clerical misprision. See section 517, Civil Code of Practice. Our question is: Was this judgment, entered when and as it was, that is, entered prematurely, void or voidable? Let us remember the jurisdiction of the court is not attacked, but the attack is leveled at this judgment because paries in privity with this Nagle title were allowed only twenty-two days instead of the full twenty-four days to which they were entitled under section 4076e, Kentucky Statutes, in which to take such steps as they may have desired to take and it was permissible for them to take under that section. This is a quesion that seems not to have heretofore been decided in Kentucky.

Let us carefully note just what is our question. An order of sale was entered on the 22d day of the November term of the Knox circuit court that should not have been entered until some time in the next term of that court, which was to begin on the first Monday in April, that is, April 5, 1920. Thus this order was entered prematurely. It was clearly erroneous, see Kentucky Union Co. v. Com., 128 Ky. 610, 108 S. W. 931, 110 S. W. 398, 33 Ky. Law Rep. 9, 49, 587, but no appeal was prosecuted from it, and Flinn and Stevens are now

attacking it collaterally in this proceeding, and this being a collateral attack they cannot succeed unless the order of sale made December 19, 1919, was absolutely void. We have had a kindred question before us, and our solution of it will help us solve the present problem. In Stockholders' First Nat. Bank v. First State Bank's Receiver, 163 Ky. 790, 174 S. W. 473, a collateral attack was made upon allowances made to a receiver who had not previously made the verified report required by section 396, Ky. Stats., a demurrer was sustained to the pleading, and upon appeal this court affirmed the judgment, and thus we have precedent for saying a premature judgment, though erroneous, is not void and cannot be successfully attacked collaterally. As we cannot improve upon the reasoning of that opinion, we invite the readers attention to it.

A similar ruling was made and this Stockholders' Case was cited in Hibbs et al. v. Perkins et al., 206 Ky. 198, 266 S. W. 1075. It is the general rule that, where the court has jurisdiction, the act of the court in entering a judgment prematurely is erroneous but it is not void. See 34 C. J. p. 92, sec. 192; 15 R. C. L. p. 866, sec. 341. If jurisdiction has once attached, then the only relief that can be had from any orders or judgments made must be obtained by direct attacks upon them. They cannot be attacked collaterally. See 34 C. J. p. 555, sec. 856, and cases cited under it.

Flinn and Stevens have also attacked the appraisement and the advertisement of the property in that old forfeiture case, but the answer to the question above answers their contention relative to these things. They cannot successfully attack collaterally anything done in that forfeiture proceeding unless it was utterly void.

### Blakeman as a Purchaser.

Blakeman as a civil engineer and surveyor made surveys and plats, examined records, and gathered data concerning this Nagle patent for the use of the commonwealth's attorney in the preparation of the pleadings in the forfeiture proceeding. This, so they contend, makes it impossible for him to be a purchaser at the sale of the forfeited title. It was quite natural for the commonwealth's attorney to ask some one having such training to gather this data for him. Attorneys frequently have such work done, for it is work that must be done before an attorney can intelligently present a

matter such as this to a court, and it is work that few attorneys are trained and prepared to do. After Blakeman did this work and became familiar with the situation, it was quite natural that as a result thereof he should be more inclined to become a purchaser than a man who knew nothing of it all, and we are unable to see any valid reason for holding he should not be allowed to purchase the title when it was sold.

In support of this contention Flinn and Stevens cite the case of Jones v. Deposit & People's Bank, 180 Ky. 395, 202 S. W. 907, which is really authority against them, for in that case one Lilleston had appraised the property that the master commissioner sold, and at the sale Lilleston in connection with his partner Miller bought eleven pieces of the property sold.

This purchase was attacked directly by exceptions filed to the report of sale. The trial court overruled the exceptions and confirmed the sale. On appeal that judgment was affirmed. This question is well discussed in that opinion, also in 35 C. J. p. 31, sec. 42. By section 1711, Ky. Stats., an officer is forbidden to purchase at a sale made by himself, yet in Sears v. Collie, 148 Ky. 444, 146 S. W. 1117, we affirmed a judgment that upheld a sale at which the master. commissioner himself had purchased the property. C. J., in the section just cited, says such purchases are not void but only voidable. We do not regard this purchase by Blakeman as being even voidable, but to enable Flinn and Stevens to succeed in their collateral attack upon it they would have to show it was utterly void and certainly it was not void

### Attack Under Section 251, Ky. Const., and Sections 2377 and 210, Ky. Stats.

The defendants cite section 251 of Ky. Const. section 2377, Ky. Stats. (same as section 1, c. 29, p. 44, Acts of 1891-92-93), and section 210 Ky. Stats. This is simply a rethrashing of old straw. Section 2377, Ky. Stats., was held unconstitutional in Shaw v. Robinson, 111 Ky. 715, 64 S. W. 620, 23 Ky. Law Rep. 998, and section 251, Ky. Const., and section 210, Ky. Stats., were construed adversely to their contention in Golden v. Blakeman, 223 Ky. 517, 3 S. W. (2d) 1095, a case arising under this same patent.

### Adverse Possession.

The chief reliance of defendants Flinn and Stevens

is that they and their grantors have held and occupied this property, claiming it as their own for such length of time that they have thereby perfected their title thereto. Therefore we will shorten our labor by a careful consideration of that subject.

Adverse possession is a collective fact, made up of other facts, which are its constituent elements, and it is the continuous coexistence of all of these constituent elements for the full statutory period that then perfects the disseizor's title. To start the running of the statute of limitations, the disseizor must have an actual possession, Terry v. Loudermilk, 158 Ky. 353, 164 S. W. 959; Whitley County Land Co. v. Powers' Heirs, 146 Ky. 801, 144 S. W. 2; it must be an open notorious, and visible possession, Brown et al. v. White et al., 153 Ky. 452, 156 S. W. 96; Arthur v. Humble, 140 Ky. 56, 130 S. W. 958; it must be a selfish or exclusive possession, that is the disseizor must hold possession for himself to the exclusion of the true owner, and all others, Spencer Christian Church's Trustees v. Thomas et al., 84 S. W. 750, 27 Ky. Law Rep. 250; Ward v. Edge, 100 Ky. 757, 39 S. W. 440, 19 Ky. Law Rep. 59; it must be a hostile possession, not only as against the true owner but as against the world, Gay v. Moffitt, 5 Ky. (2 Bibb) 506, 5 Am. Dec. 633; Young v. Pace, 145 Ky. 405, 140 S. W. 555; it must be a definite possession, that is its confines must be marked by an inclosure or other plainly visible indications; the disseizor must fly his flag, and indicate the lines of his dominion, the extent of his possession must be evident, Gatliff v. Carson-Muse Lumber Co., 169 Ky. 810, 185 S. W. 110; and it must be a possession under a claim by the disseizor of ownership in himself, so notorious as to amount to a constructive notice of its adverseness; Combs et al. v. Turner et al., 193 Ky. 636, 237 S. W. 37. When all these things coexist, the running of the statute starts. To keep it running the disseizor must in this commonwealth maintain that status in full vigor in all its elements for every hour of every day for 15 years (see Jones v. McCauley's Heirs, 63 Ky. [2 Duv.] 14; Combs v. Ezell, 232 Ky. 602, 24 S. W. [2d] 301), and when he does, he gets his reward, he gets title to the premises so held, not for any virtue of his own, for he may have none, but because of the failure of the true owner to assert his title and put a stop to the acts of the disseizor. Since the disseizor by such an adverse possession so maintained appropriates the title of the

true owner without compensation, then every one of the constituent elements of adverse possession must be clearly and unequivocably established. Mounce et al. v. Hargis et al., 211 Ky. 761, 278 S. W. 107; Adams v. Adams, 194 Ky. 202, 238 S. W. 386; Upchurch v. Suttcn Bros., 142 Ky. 420, 134 S. W. 477.

"A person who has under a good title constructive possession of a boundary of land is not required to take notice of subsequent deeds or patents that may be acquired by strangers to his title, or to look to the records for the purpose of ascertaining if any person has subsequently secured a deed or a patent covering the land embraced by his senior patent. He need only look to the land itself. So long as the land itself is free from actual intrusion, his title and constructive possession will remain undisturbed and unaffected. These principles have been announced by this court in a long line of decisions, beginning with Trimble v. Smith, 4 Bibb, 257, decided in 1815, and ending with Cumberland Coal Co. v. Croley, 172 Ky. 222 [189 S. W. 198], decided in 1916." Brewer v. Ward Fork Land Co., 172 Ky. 598, 189 S. W. 717, 719.

In other words, an owner of real property does not have to stand guard over the county records to see that his land is not conveyed away by some one else.

### Constructive Possession.

We will better understand our question by looking briefly at constructive possession. It is that possession which follows in the wake of the title. In contemplation of the law, the true title owner is in possession of his land all the time. The law regards him all the time as standing upon each and every square foot of his property, therefore in the eyes of the law he knows everything that occurs upon his property. We speak of those trespassers who come and stay upon his property as disseizors, because they oust or destroy the true owner's possession. When the disseizor enters a particular square foot that pushes the true owner off of it, that disseizes him, and if he remains disseized for 15 years he loses his title to that square foot. If the disseizor steps off, however, even on the 364th day of the 14th year, the law sees the true owner as immediately stepping back and the disseizor must begin all over again.

### The Claim of Adverse Possession.

It is admitted that Campbell Smith lived in a house

near to where Glade branch empties into Buzzard creek from 1870 until he sold to Churchill in 1891. He claimed to own a large body of land about 2,400 acres, west and northwest of where he lived. When he sold to Churchill, he did not include the place where he lived but reserved or by survey excluded from his conveyance to Churchill 100 acres of land about his house which is in this record referred to as the "Reservation." As a claim of ownership is an essential element of adverse possession, then the adverse possession of Campbell Smith of the land now claimed by the defendants came to an end when he sold it to Churchill. We have no further interest in the reservation, but our interest is confined to what was sold to Churchill and is now claimed by the defendants. The claim of adverse possession to be sustained must be thereafter supported by an actual possession under a claim of ownership by Churchill supported by such previous claim and possession by Smith as they are able to properly connect with it.

### The Evidence.

The evidence consists of the depositions of 79 witnesses and 102 exhibits, hence it will be impracticable to discuss the evidence in detail, and we shall only discuss it generally. Counsel for appellants has divided it into divisions (a), (b), and (c), and we shall adopt and follow his division of it.

### (a) Possession of Campbell Smith.

This possession came to an end April 13, 1891, when he sold to Churchill, at which time there was a definite break in the possession and we find not even an attempt to show possession thereafter until Ford bought this property on December 15, 1895, so unless Campbell Smith had held this land long enough to have matured title in himself previous to April 13, 1891, it will be of no help to the defendants. We shall first consider the evidence of his possession of those tracts to which he had some color of title.

We find a deed of James White et al. to Campbell Smith made February 15, 1867, which contains this description:

"Beginning on the bank of Buzzard's Creek below the end of the long field and above the field at the mouth of the Bill Payne Hollow and to run up the hill on both sides of said creek to the top of

the hill, so as to include that the branches of said creek flow into the said creek above said line which is marked on a small beach howbean trees on the south side of the said Buzzard Creek and on a small black walnut tree on the hillside on the north side of said Creek.''

That description is utterly meaningless and no attempt was made to locate that property or to show any possession taken or maintained under that deed. This seems to have been the land where Campbell Smith lived.

Miller Abner et al. conveyed 145 acres to Campbell Smith, June 11, 1884, but no attempt was made to show previous possession by Abner et al., so if Campbell Smith had taken possession at once, he could not have matured title in himself before he sold in 1891.

On October 7, 1890, George Baird and wife executed a deed to Campbell Smith, for two tracts, first 100 acres, but as there is no evidence of previous possession by Baird, we need give no further thought to it. Second, a half interest in 50 acres of land patented to Alex W. Chastain and Campbell Smith, July 16, 1869, but if that is a part of the land claimed by defendants, it is of no help to them as it is a junior patent and void, and there is no evidence of any possession on it maintained by Campbell Smith either alone or in partnership with Chastain or any one else, so we give this no further thought.

On February 16, 1871, a patent for 50 acres on Buzzard creek was issued to Campbell Smith, but there is an utter failure of proof of any possession ever identified as maintained on it, and as it was a junior patent we need say no more about it.

A tract of 100 acres was patented to Campbell Smith on February 1, 1889, but that was a junior patent and, of course, Campbell Smith could not have matured title in himself to this before he sold to Churchill.

This is all the evidence there is that Campbell Smith ever acquired title to anything in the usual way. None of the foregoing could afford Campbell Smith anything more than color of title for since the act of January 25, 1811 (Laws 1811, c. 240, p. 67), all patents issued for land previously patented by Virginia have been declared void by statute. So the only way he could get

title to any of the property which the defendants now claim under him would be by adverse possession, and clearly he has not acquired such a title to any of the above property.

Defendants introduce nine old men who testify about the land defendants now claim. A fair summary of their evidence is that Campbell Smith lived near the confluence of Glade branch and Buzzard creek, which no one disputes, and claimed to have 2,000 or 2,500 acres of land west and northwest of where he lived and had some houses upon it, five including his own, and had cultivated patches about these houses. Two of these houses and the cultivated lands about them are definitely located within the "Reservation," so they fade out of the picture. The other three houses were probably built upon the land claimed by defendants, but there is no satisfactory evidence where, when, by whom, or how long maintained.

These men who testify in 1930 were rather young men when Campbell Smith sold to Churchill in 1891, their average age being then 22 and the oldest being 45, but to sustain a claim of such an adverse possession by Campbell Smith as would mature his title, they must go back 15 years further to 1876. Only one of them was then a grown man, two were 14, and one was 13, and hence their testimony is rather general and uncertain, but we shall discuss briefly the evidence of these four.

John Ruth, who was 14 years old in 1876, was asked if he knew the extent of Campbell Smith's boundaries and he said, "No." All he knew of Smith's possession then was that he went there to get some hogs, spent one day there, and Smith had then some fields cleared and fenced, and had three or four houses on it.

John C. White was 13 years old in 1876, he did not know how many people lived on the land, or where or what they used it for.

P. B. Reynolds was 30 years old in 1876, he did not know how many tracts of land Smith claimed, or the sources of his title. He had never been all the way around Smith's claimed boundary. He saw marked line-trees along part of it, but did not know who marked them.

John L. Cottongim, a son-in-law of Campbell Smith, was 14 in 1876, he said he did not know the lines, but Campbell Smith owned "all back up in there."

None of the other old men who testified was over 3 years old in 1876, so we will say nothing of their evidence. When we consider this evidence in the light of what it takes to create a title by adverse possession as set out above, it is clear that it falls short of those requirements.

The defendants asked with such persistency about Campbell Smith's continued residence and claim that we will say something about that. His residence was on the tract referred to as the "Reservation." We are not concerned with that but it is contended that while living there he marked out for himself a vast boundary west and northwest of that which he claimed and of which defendants assert he had adverse possession, thus describing an effort to acquire title by stretching, a good illustration of which is Holcomb v. Swift Coal & Timber Co., 251 Ky. 642, 65 S. W. (2d) 741. While there is no satisfactory evidence that Campbell Smith had a well-marked boundary around this entire 2,500 acres, still he could not while living on the "Reservation" acquire title through such a stretching operation to other property about which he might mark a line. A disseizor to acquire title by adverse possession must have possession of the property he hopes to acquire. He is not in possession of it, if while he is living on another tract, he simply mentally extends his claim over it. He must be there with his flags flying and his possession openly and visibly manifested. That question has so often been before this court that in Elliott v. Hensley, 188 Ky. 444, 222 S. W. 507, 510, we said:

> "Notwithstanding the plain declarations in the cases cited that a person who has good title to a tract of land on which he actually resides cannot assert title by adverse possession to an adjoining tract that he claims under a color of title deed or patent, without having made any actual entry and taking actual possession thereof, attorneys are continually, but unavailingly, attempting to ignore the principle so firmly established."

There is a difference between the things necessary to maintain possession by the true owner and the things necessary to maintain possession by a disseizor, and that is discussed and pointed out in Miniard v. Napier, 167 Ky. 208, 180 S. W. 363, and in Stearns Coal & Lumber Co. et al. v. Boyatt et al., 168 Ky. 111, 181 S. W. 962.

We must remember all the time this title was in Blakeman's predecessors in title and Campbell Smith was a trespasser. The possession of Blakeman's predecessors was rightful, that of Campbell Smith was wrongful. Every presumption is in favor of the former and against the latter. All Campbell Smith did was to stretch and mark a line around this 2,500 acres and at some time build some houses upon it and to claim it. That was not enough, see Helton v. Strubbe, 62 S. W. 12, 22 Ky. Law Rep. 1919.

"In order to acquire title by possession as against an elder grant, the party asserting such a title must take actual physical possession of all the land which he proposes to acquire, and hold it adversely, actually, and continuously for the full statutory period; and the masting of hogs thereon, or the ranging of cattle, or the conducting of a sugar camp, will not constitute such adverse possession within the meaning of the law." Courtney et al. v. Ashcraft et al., 105 S. W. 106, 31 Ky. Law Rep. 1324.

"Adverse possession cannot be sustained by proximity or intention. It can only rest on physical acts, such as will give to the real owner of the land notice that some other person is in possession of it." Whitley County Land Co. v. Powers' Heirs, 146 Ky. 801, 144 S. W. 2, 7.

"In Ohio & Big Sandy Railroad Co. v. Wooten, 46 S. W. 681, 20 Ky. Law Rep. 383, it was said: 'That mere ownership, with frequent cutting and removing of timber from the tract of land, does not constitute actual occupancy or possession within the meaning of the law.'" Combs v. Turner, 193 Ky. 636, 237 S. W. 37, 39.

"The mere operation of the water mill at such times as the water was sufficient, accompanied by a claim of the entire tract to a well-marked boundary, was not sufficient to constitute an adverse holding." H. F. Davis & Co. v. Sizemore et al., 182 Ky. 680, 207 S. W. 16, 17.

"The mere user, by hauling the gravel or sand from them for years, when the proof shows that during the greater part of each year the islands are submerged, and not regarded of much value until of recent date, will not be sufficient to deprive the real owner of this right." Strange et al. v. Spalding, 29 S. W. 137, 17 Ky. Law Rep. 305.

"Adverse possession can rest only on physical acts of such character as will give to the real owner of the land constant notice that some other person is in possession of the property. It must be continued uninterruptedly for 15 years. The surveying and marking of a boundary, the payment of taxes, and occasional entries for the purpose of cutting timber are not sufficient to constitute adverse possession." Griffith Lumber Company v. Kirk et al., 228 Ky. 310, 14 S. W. (2d) 1075, 1076.

Defendants cite the testimony of Wm. Bailey who testified that Campbell Smith had possession of certain fields for 15 years, but those fields were part of the reservation and no part of the land claimed by defendants. Besides erecting some houses somewhere, Smith had various short-term cultivations. He would have a piece of land cleared and cultivated for 3 or 4 years, by that time the soil was exhausted and that piece was abandoned and another piece cleared and cultivated for 3 or 4 years, then that would be abandoned and a third piece cleared and so on. A cultivation year after year is a possession of the boundary cultivated and obviates the necessity of an inclosure. Abbott v. Perkinson, 144 Ky. 495, 139 S. W. 745, Ann. Cas. 1913A, 747, but when he fails to cultivate any year, the disseizor has hauled down his flag and surrendered his dominion, and his boundary is lost. Where these cultivations were is not definitely shown, whether within land to which Smith had color of title is not shown, the presumption being against Smith, we must regard them as without any color of title or definite boundary for none is shown. Judge Cochran said:

"There is no such thing as possession of land save in connection with a well-defined boundary thereof. Without a well-defined boundary there can be no possession. To have possession of a well-defined boundary of land, it is not sufficient that one claim it. He may claim it as long and as loudly as he sees fit, but he does not acquire possession of a foot of it."

"If in addition, it appears that the person entering has a right to enter on a part of the land within such boundary, and not to enter on another part thereof, and he enters on the part on which he has a right to enter, he acquires no possession beyond the part on which he has the right to enter;

and this, notwithstanding there may be no doubt as to his intent thereby to take possession of the whole boundary. The pioneer case in which this was laid down is the case of Trimble v. Smith, 4 Bibb [Ky.] 257. It has been laid down frequently since. * * *

"Claim of ownership and possession is of no avail here, any more than in any other case. Nor is knowledge of the fact of such claim on the part of the owner of any avail. The one essential thing is that there must be an entry on the land." Kentucky Coal & Timber Development Co. v. Kentucky Union Co. et al. (D. C.) 214 F. 590, 622.

It is not enough to show these cultivations were on Mill branch, Glade branch, or Hays fork, they must be definitely located by a survey of them, so they may be relocated if necessary and they must be shown to have continued without interruption for 15 years. These possessions by Smith are not definite and they are wanting in continuity. It is clear that Campbell Smith did not even begin to show such an adverse possession as would invest him with title.

### (b) Possession by Ford.

To begin with, let us notice the gap or hiatus between April 13, 1891, when Smith sold to Churchill, and December 15, 1895, when Smith, having recaptured the title, sold to R. C. Ford, a period of 4 years, 8 months, and 2 days during which we have no evidence of any possession whatever.

Ford had a definite boundary that gave him color of title, but if we admit he had some one on it all the time, he owned it, that is not enough, for he had owned the property but 14 years, 9 months, and 18 days when on October 3, 1910, he sold it to Mrs. Garrard.

We have read this record carefully in search of the name of some tenant who was on the property when Ford sold to Mrs. Garrard, but have found none. They had Senior Smallwood looking after this land but Smallwood did not live on it, but lived on Campbell Smith's reservation. He could not while living there be occupying the premises now claimed by the defendants in such a manner as to amount to a disseizin of the true title owner. Mrs. Garrard purchased from Ford October 3, 1910, but we find no evidence there was then a tenant on

the land, that one was put on there while she had it, or one was on there when she sold it.

On July 24, 1911, Mrs. Garrard sold to ғıınn, and Smallwood continued in the same manner to look after the property for Flinn. That was only caretaking, that was not possession, that was not enough. If a would be disseizor desires to do any disseizing, he must get upon and hold possession of the coveted property, he must do his disseizing there, he cannot do it elsewhere. Disseizure cannot be accomplished by any form of absent treatment. The disseizor must not only get upon and keep possession of the property he covets, but he must do so in such a manner as to push the true owner off of it and keep him off, for at the first possible moment, the true owner re-enters, in the eyes of the law, and there he stands and stays upon each and every square foot of it, and there remains through summer and winter, hot and cold, day and night, rain or shine.

### (c) Flinn's Possession.

For some years Flinn had no one on the property, but continued Smallwood as a caretaker, but Smallwood lived elsewhere.

It is argued for Flinn and Stevens that Smallwood had a lease that was made to him by Elisha H. Flinn, the father of the present appellants, which is perhaps true; but he did not live on the leased premises, and to constitute an adverse possession that may ripen into title, the coveted premises must be actually occupied, as we have already pointed out.

Some form of actual occupation is a sine qua non to the acquisition of title by adverse possession. No, matter how long, how loud, or how often a would-be disseizor may either in person or by agents or lessees proclaim himself to be the owner of a piece of property, or, how many leases or deeds he may execute or obtain, unless he actually occupies it in person or by agent, the title of the true owner is not affected thereby. The trial court found Flinn and Stevens had had no actual possession, and a consideration of the evidence does not even raise a doubt in our mind of the correctness of that finding. The first actual possession satisfactorily shown is the one we shall now discuss.

### A Real Possession Begins.

The defendants built a house on the land in con-

troversy and on May 5, 1915, their tenant Granville Delph moved into it and there he has since remained. Thus on March 30, 1929, when this suit was filed, the defendants were in the adverse possession of the premises and had been so for 13 years, 10 months, and 25 days, and when the forfeiture was adjudged they had had such possession for less than 5 years. This possession by Delph as tenant for the defendants meets every requirement of section 2505 of Ky. Stats., except length of duration, wherein it is 1 year, 1 month, and 5 days short and in like manner it was not enough to bring the defendants within the provisions of section 4076g, Ky. Stats.

### Suit in Knox County.

This 12,000-acre Maurice Nagle patent lies partly in Knox county and partly in Clay county, and a portion of the land claimed by the defendants lies in Knox and a portion in Clay. The defendants have questioned the jurisdiction of the Knox circuit court over that part of the Maurice Nagle patent that lies in Clay county and that part of the tract claimed by the defendants that lies in Clay county, thus raising the question of venue, concerning which this is said in 51 C. J., p. 204, sec. 134:

> "Under constitutional or statutory provisions relating specifically to actions to quiet title, or generally to actions, affecting real property, an action to quiet title is local in its nature, and the venue is determined by the location of the property, and not by the residence of the party, and must therefore be brought in the county in which the land or a part thereof is situated."

The venue of this action to quiet title is definitely fixed in either of these counties by section 11, Ky. Stats., and the venue of the action for forfeiture is by section 4076d definitely fixed in either of them. Thus we find the court had jurisdiction, and, having found no error in the record, the judgment is affirmed.